**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                 :

In re GEOPHARMA, Inc. SECURITIES      :
LITIGATION                                    :   **OPINION AND**
                                                 :   **ORDER**
THIS DOCUMENT RELATES TO:       :
ALL ACTIONS                                        :   04 Civ. 9463 (SAS)
                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

# I.    INTRODUCTION

Plaintiffs bring this putative class action on behalf of certain purchasers of common stock in GeoPharma, Inc. ("GeoPharma"), a publicly-traded pharmaceutical company.  The gravamen of plaintiffs' allegations is that defendants issued a deliberately misleading press release that caused investors to believe that the Food and Drug Administration ("FDA") had granted GeoPharma approval for a new drug, when in fact the FDA had merely approved a (much less potentially lucrative) medical device.  Plaintiffs allege violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC").[1]  Defendants now move to dismiss the Complaint pursuant to Federal Rule of Civil Procedure

---

[1]      15 U.S.C. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10(b)(5).

12(b)(6).[2]  For the following reasons, defendants' motion is granted.

## II.    THE COMPLAINT

### A.    The Parties

Plaintiffs are a group of investors who purchased GeoPharma common stock during the putative class period.[3]  Plaintiffs are suing on behalf of a putative class defined as "all persons or entities who purchased the common stock of GeoPharma on December 1, 2004 and/or December 2, 2004, inclusive (the 'Class Period'), and who were damaged thereby."[4]

GeoPharma manufactures, packages and distributes dietary supplements, over-the-counter drugs, pharmaceuticals and health/beauty care products for companies.[5]  Belcher Pharmaceuticals, a unit of GeoPharma, develops and manufactures generic and over-the-counter drugs.[6]

---

[2]    *See generally* Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Class Action Complaint ("Def. Mem.").

[3]    *See* Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws ("Complaint") ¶ 5. The lead plaintiffs are Mike Moshayedi, Hung Van Luong, Joseph Adevai, Guy Shilling and Scott M. Syring. *See id.*; *see also* Order Dated March 9, 2005 (appointing lead plaintiffs).

[4]    Complaint ¶ 1.

[5]    *See id.* ¶ 21.

[6]    *See id.* ¶ 6.  GeoPharma also includes another unit, Innovative Health Products, that develops and manufactures nutritional supplements.  *See id.*

Plaintiffs also name three individual defendants, all of whom are officers and directors of GeoPharma.  Kotha S. Sekharam is President,[7] Mihir K. Taneja is the Chief Executive Officer and Secretary,[8] and Jugal Taneja is the Chairman of the Board of Directors.[9]  All three individual defendants held their current positions during the putative class period.[10]

**B.     The Alleged Scheme**

**1.     Development of Mucotrol**

Beginning in early 2004, GeoPharma made several announcements regarding its development of a new product, eventually designated as Mucotrol, intended to treat a condition called mucositis.[11]  Mucositis is an inflammation of the mucosa in the mouth, caused by chemotherapy and radiation.[12]   According to a GeoPharma press release excerpted in the Complaint, "mucositis affects approximately 15-40% of patients receiving standard-dose chemotherapy and 76-

---

[7]     *See id.* ¶ 7(c).

[8]     *See id.* ¶ 7(b).

[9]     *See id.* ¶ 7(a).  The Complaint does not otherwise refer specifically to Jugal Taneja.

[10]     *See id.*  ¶¶ 7(a), (b), (c).

[11]     *See  id.* ¶¶ 33-37.

[12]     *See  id.* ¶ 33.

100% of patients receiving higher doses of chemotherapy in bone marrow

transplant . . . [m]ucositis complications may lead to (a) delay in the chemotherapy

schedule (b) reduction from the desired dose (c) complications such as pain,

dehydration, malnutrition and infection."[13]

On June 29, 2004, GeoPharma filed its annual report with the SEC.

According to a GeoPharma Form 10-K filed at that time:

> [F]ormulation work and stability studies are currently underway on
> three other drug products one of which is a product that treats
> mucositis . . . [w]e have developed a formulation using all natural
> ingredients.  Preliminary results indicated promising results in the
> regeneration of mucosal lining.  We have filed a patent on this
> formulation.  Preliminary double blind placebo controlled clinical
> studies are underway in a prestigious hospital abroad.[14]

Defendants again referred to a mucositis drug in a July 13, 2004 press

release (entitled "GeoPharma Reports Success in Clinical Studies on Oral

Mucositis Drug for Cancer Patients.")[15]  The release reported that GeoPharma had

completed a double blind clinical study to evaluate the efficacy of "a patent-

pending drug for mucositis in cancer patients."[16]  This press release also stated that

---

[13]     *Id.* ¶ 34 (quotation omitted).

[14]     *Id.* ¶ 34.

[15]     *See id.* ¶ 36.

[16]     *Id.* ¶ 36.

"the market potential is estimated to be at $300 million to $500 million."[17]  In the same release, defendant Sekharam was referred to as the drug's inventor, and was quoted as asserting that this drug was expected to have no side effects.[18]

However, while GeoPharma had characterized this new mucositis treatment as a drug, by September 2004 it apparently realized that it was actually a medical device.  On September 1, 2004, GeoPharma filed an application with the FDA seeking 510(k) approval[19] to market a medical device by the name of Mucotrol Concentrated Oral gel wafer ("Mucotrol").[20]  Nowhere on the application was Mucotrol referred to as a drug.[21]

The FDA granted marketing approval for Mucotrol in a letter dated November 24, 2004.[22]  This letter stated that, as required by the 510(k) approval

---

[17]     *Id.* ¶ 36.

[18]     *See* Complaint ¶ 36.

[19]     The Complaint does not define this term, but a 510(k) application is a premarketing submission to the FDA, seeking to demonstrate that the device to be marketed is substantially equivalent to legally marketed devices that are not subject to FDA premarket approval for one of several reasons.  *See* Premarket Notification, at http://www.fda.gov/cdrh/devadvice/314.html.

[20]     *See* Complaint ¶ 40.  The submission listed defendant Sekharam as the company contact for the application.  *See id.*

[21]     *See id.* ¶ 40.

[22]     *See generally* Complaint Ex. B.

process, the FDA determined that the device is substantially equivalent to other products already in the market.[23]  Defendants did not disclose the receipt of this letter until December 2, 2004.[24]

Plaintiffs assert that GeoPharma's sudden shift from development of a drug to a medical device carries great significance.  A device has a more limited market than a drug, because a device can only be used for relief once mucositis develops, while a drug can be administered to cancer patients to reduce their chances of developing mucositis in the first place.[25]   Similarly, a drug, but not a medical device, shortens hospital stays, a factor important to insurance companies.[26]  Finally, while there was no available drug for treatment of mucositis, there were already several medical devices in the market.[27]  For these reasons, plaintiffs estimate the potential market for a medical device treating mucositis at $1.2 million, as opposed to $150 million for a drug treatment.[28]

---

[23]     *See id.* ¶ 41; *id.* Ex. B; *see also supra* note 19.

[24]     *See id.* ¶ 42.

[25]     *See id.* ¶ 43.

[26]     *See id.* ¶¶ 43-44.

[27]     *See id.* ¶ 43.

[28]     *See id*.

## 2. The December 1 Press Release

On December 1, 2004, prior to the opening of the trading day, GeoPharma issued a press release entitled "GeoPharma, Inc. Receives FDA Approval for Mucotrol™; Manages Mucositis Caused by Radiation and Chemotherapy Required in Cancer Treatment" ("The December 1 Release").[29] The Release states in pertinent part that "GeoPharma, Inc. today announced that Belcher Pharmaceuticals, Inc., a wholly-owned subsidary of GeoPharma, Inc., has received approval from the [FDA] for Mucotrol™, a *prescription product* for the management of oral mucositis/stomatitis."[30] The release also estimated that, given the number of people who suffer from mucositis, "oncology market potential for Mucotrol™ sales are between $75 million and $300 million per annum and the estimated global market is between $250 million and $1 billion per annum."[31]

Plaintiffs allege two misstatements and an actionable omission in the December 1 Release.[32] *First*, plaintiffs allege that the Release's statement that GeoPharma "received approval from the [FDA] for Mucotrol, a prescription

---

[29]  *See id.* ¶ 47.

[30]  *Id.* (emphasis added).

[31]  *Id.*

[32]  *See id.* ¶¶ 47-49.

product for the management of oral mucositis/stomatitis" is misleading because it failed to make clear that, despite GeoPharma's earlier statements, Mucotrol was approved as a medical device and not a drug.[33]  *Second*, plaintiffs allege that GeoPharma had a duty to disclose that Mucotrol had existing competition in the field of medical devices addressing mucositis.[34]  Finally, the Release allegedly "materially overstated" the market potential for Mucotrol.[35]

The December 1 Release had a dramatic effect on GeoPharma's stock. That morning, the price zoomed to an all-time high of $11.25 per share, a one-day increase of 153%.[36]  Volume was extraordinary as well; 42 million shares changed hands on December 1, against an average daily volume of 22,000 shares.[37]

### 3.    Corrective Disclosures

This newfound prosperity did not last even half a day.  In response to

---

[33]    *See id.* ¶ 49(a).

[34]    *See id.* ¶ 49(b).  Specifically, plaintiffs allege that GeoPharma should have disclosed that "Mucotrol was in direct competition with at least two other products which had been in the market for an extended period of time – Sinclair Pharmaceuticals' Gelclair Concentrated Oral Gel and Carrington Labs' RadiaCare Oral Wound Rinse." *Id.*

[35]    *See id.* ¶¶ 49(c), (d).

[36]    *See id.* ¶ 48.

[37]    *See id.*

media inquiries, an FDA spokesperson erroneously stated that the agency had no record of *any* approval for Mucotrol.[38]  After the FDA statement, the price of GeoPharma stock promptly cratered.  When trading was halted at approximately 1:30 p.m. on December 1, the stock had fallen to $6.81 per share.[39]

  The FDA then corrected its misstatement, clarifying that Mucotrol had received marketing approval as a medical device.[40]  The next day, GeoPharma issued another press release prior to the opening of the market, intended to address the confusion caused by the December 1 Release.  This release stated in pertinent part:

> [i]n an earlier press release (July 2004), GeoPharma, Inc. had announced the results of a double blind clinical study of their produc[t] (MF5232, now called Mucotrol™).  On December 1, 2004, a press release was issued by the Company after receiving FDA Section 510(k) pre-market approval, noting that the FDA approval allows for the marketing of the medical device based on the FDA's finding of the device being 'substantially equivalent to legally marketed predicate devices.'  The Company's application to the FDA requested approval for this prescription device to be approved to be marketed for the mechanical action indicated for the management of pain by soothing oral lesions caused by chemotherapy or radiotherapy mucositis/stomatitis, oral irritations due to oral surgery, braces or dentures in addition to diffusing apthous ulcers.  Although it is estimated that approximately

---

[38]  *See id.* ¶ 50 (emphasis added).

[39]  *See id.*

[40]  *See id.*

300,000 cancer patients in the U.S. suffer from mucositis, revenues from the Company's distribution of Mucotrol™ cannot be estimated at this time.[41]

On December 2, 2004, GeoPharma shares rose 8.22% to close at $7.37 (at one point reaching an intra-day high of $9.58).[42]

After the markets closed on December 2, GeoPharma and two of the individual defendants held a conference call with investors to discuss the December 1 Release. On the call, defendants Mihir Taneja and Sekharam declined to provide a basis for the previous estimate of Mucotrol's market potential.[43] Asked why previous company releases referred to development of a drug to treat mucositis, when Mucotrol itself was a device, Sekharam stated that the Company initially tried to develop a drug treatment but ended up with a device.[44]

Plaintiffs allege that due to the further disclosures made on the conference call, GeoPharma's share price fell 12.48% in after-market activity on December 2, closing at $6.45 per share. The shares fell to $5.46 per share the next

---

[41]    *Id.* ¶ 51.

[42]    *See id.* ¶ 52.

[43]    *See id.* ¶ 53.

[44]    *See id.* ¶ 54.

day.[45]

### 4. Scienter Allegations

Plaintiffs allege that in 2004 GeoPharma embarked on a strategy to "transition [into] a drug manufacturer," for which "the Company needed to raise substantial capital, which it subsequently did."[46] To this end, GeoPharma entered into three separate financing arrangements in the Spring of 2004.[47] The terms of each agreement vary, but in brief plaintiffs allege that:

> Under the terms of the Company's financing agreements, Defendants could force a portion of its note holders and preferred shareholders to accept shares of the Company's common stock in lieu of cash payments if the stock reached a minimum of $7.19 per share for only five consecutive days. From the middle of March 2004, until the start of the Class Period, the price of GeoPharma stock did not trade above the trigger prices for the required period of time. Accordingly, during this time, Defendants [made] expensive monthly cash payments to the Company's note holders and preferred stock owners.[48]

---

[45]    *See id.* ¶ 53.

[46]    *Id.* ¶ 24; *see also id.* ¶¶ 23, 37-38 (discussing the Company's plan to focus more on generic drug manufacture going forward). Plaintiffs allege that GeoPharma began 2004 with "only" $920,500 in cash, an amount that they imply was insufficient to achieve its goals. *See id.* ¶ 24.

[47]    *See id.* ¶¶ 25-32.

[48]    *Id.* ¶ 32. Each of the three financing arrangements had different standards for when GeoPharma could exercise the conversion feature. *See id.* ¶ 30 (term note, convertible into common stock if that stock trades higher than $7.19/share for five consecutive trading days); *id.* ¶ 27 (warrants, convertible if

Therefore, defendants "were motivated to engage in the fraudulent scheme . . . in order to force the conversion of GeoPharma's debt and equity financing into common stock (which it would be able to do if the Company's stock reached certain levels for five consecutive days) in order to avoid making substantial monthly payments on its Term Note and preferred stocks."[49]

Plaintiffs also allege that defendants knew that the December 1 Release was materially false or misleading:

> Defendants knew that the Company had submitted an application to the FDA for approval of a medical *device*, not a *drug*, and knew that the FDA had approved Mucotrol as a medical *device*, not as a *drug*. Nonetheless, in numerous statements prior to the Class Period, Defendants represented that Mucotrol was a *drug* and when Defendants announced the FDA approval during the Class Period, they failed to disclose that the approval was for a medical device with a dramatically smaller market than that of a *drug*.[50]

## III. LEGAL STANDARD

### A. Standard of Review

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a motion

---

stock trades higher than $7.26/share for five consecutive trading days); *id* ¶ 29 (preferred stock, convertible if stock trades at an average higher than $15/share for ten consecutive trading days).

[49]     *Id.* ¶ 62.

[50]     *Id.* ¶ 61 (emphasis in original).

-12-

to dismiss should be granted only if "'it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim[s] which would entitle [them] to relief.'"[51]  The task of the court in ruling on a Rule 12(b)(6) motion is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."[52]  When deciding a motion to dismiss, courts must accept all factual allegations in the complaint as true, and draw all reasonable inferences in plaintiffs' favor.[53]  Courts generally do not consider matters outside the pleadings but may consider documents attached to the pleadings, documents referenced in the pleadings, or documents that are integral to the pleadings.[54]  Courts may also "take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment."[55]

---

[51]     *Weixel v. Board of Educ. of City of New York*, 287 F.3d 138, 145 (2d Cir. 2002) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

[52]     *Levitt v. Bear Stearns & Co., Inc.*, 340 F.3d 94, 101 (2d Cir. 2003) (quotation marks and citations omitted).

[53]     *See Chambers v. Time Warner Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

[54]     *See id.* at 152-53; *see also In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 331 (S.D.N.Y. 2003).

[55]     *Ganino v. Citizens' Utilities Co.*, 228 F.3d 154, 167 n.8 (2d Cir. 2000) (citing cases).  *Accord In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, No. 02 Civ. 5575, 2004 WL 992991, at *38 n.61 (S.D.N.Y. May 5, 2004).

## B.    Section 10 and Rule 10b-5

To state a prima facie case for securities fraud under section 10 of the Exchange Act and Rule 10b-5 promulgated thereunder, a plaintiff must allege that "'the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused injury to the plaintiff.'"[56]   The requisite state of mind, or scienter, in an action under section 10(b) and Rule 10b-5 is "'an intent to deceive, manipulate or defraud.'"[57]

Securities fraud actions are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).[58]  A plaintiff alleging securities fraud under section 10(b) and Rule 10b-5 must also satisfy the heightened pleading standards of the Private Securities Litigation Reform Act of

---

[56]    *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir. 2003) (quoting *Ganino*, 228 F.3d at 161 (citing cases)).

[57]    *Ganino*, 228 F.3d at 168 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).

[58]    Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances concerning fraud and mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind may be averred generally." *See also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69-70 (2d Cir. 2001) (applying Rule 9(b) standard to securities fraud claims).

1995 ("PSLRA").[59]  To plead a material misrepresentation or omission under the

PSLRA "the complaint [must] specify each statement alleged to have been

misleading, the reason or reasons why the statement is misleading, and, if an

allegation regarding the statement or omission is made on information or belief, the

complaint shall state with particularity all facts on which that belief is formed."[60]

"To meet the pleading standard of Rule 9(b), this Court has repeatedly required,

among other things, that the pleading 'explain why the statements were

fraudulent.'"[61]

### 1.    Actionably False or Misleading Statement

To state a cause of action under section 10(b) and Rule 10b-5, a

plaintiff must first plead that defendants made "a false material representation or

omitted to disclose material information."[62]  Liability is not restricted only to

statements that are literally false: **"**[s]ome statements, although literally accurate,

can become, through their context and manner of presentation, devices which

---

[59]     Pub. L. No. 104-67, 109 Stat. 737 (1995).  *See Novak v. Kasaks*, 216
F.3d 300, 306 (2d Cir. 2000).

[60]     15 U.S.C. § 78u-4(b)(1)(B).

[61]     *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (quoting *Mills v.
Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993))**.**

[62]     *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995).

-15-

mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."[63] Therefore, a statement or omission is actionably misleading when a reasonable investor would have been misled.[64] **This determination is fact-specific, rarely amenable to disposition as a matter of law.[65]**

Regarding omissions, generally there can be no liability for an omission under Rule 10b-5 absent a duty to disclose the omitted information.[66] Omissions are actionable only when they cause the statements actually made to be

---

[63] *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990). *Accord High View Fund, L.P. v. Hall*, 27 F. Supp. 2d 420, 425 (S.D.N.Y. 1998) ("the central issue . . . is not whether the particular statements taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misl[ed] a reasonable investor about the nature of the [securities].") (alterations in original; quotation and citation omitted).

[64] *See McMahan & Co.,* 900 F.2d at 579; *see also Fogarazzo v. Lehman Bros.*, 341 F. Supp. 2d 274, 292 (S.D.N.Y. 2004) (among the requirements to sustain a 10b-5 claim is that defendant made a statement that was "objectively misleading").

[65] *Cf. Wertheim Schroder & Co. v. Avon Prods., Inc.*, No. 91 Civ. 2287, 1993 WL 126427, at *15 (S.D.N.Y. Apr. 1, 1993) (denying defendant summary judgment because plaintiff created a genuine issue of fact on the issue of whether defendants' statements were misleading even if literally true).

[66] *See Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988); *see also In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).

misleading, or if a duty to disclose is created by statute or regulation.[67]

## 2. Scienter

Under the PSLRA, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[68] "Although speculation and conclusory allegations will not suffice, neither do we require 'great specificity' provided the plaintiff alleges enough facts to support 'a strong inference of fraudulent intent.'"[69] Facts giving rise to a strong inference of scienter can be alleged by one of two methods: the plaintiff may plead "motive and opportunity to commit fraud" or "strong circumstantial evidence of conscious misbehavior or recklessness."[70]

### i. Motive and Opportunity

"Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged," while "[o]pportunity would entail the means and likely prospect of achieving concrete

---

[67]  *See Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992); *see also Robbins v. Moore Med. Corp.*, 894 F. Supp. 661, 668 (S.D.N.Y. 1995).

[68]  15 U.S.C. §78u-4(b)(2).

[69]  *Ganino*, 228 F.3d at 169 (quoting *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir. 1999)).

[70]  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quotation and citation omitted).  *Accord Novak,* 216 F.3d at 311.

benefits by the means alleged."[71]  "Motives that are generally possessed by most

corporate directors and officers do not suffice; instead, plaintiffs must assert a

concrete and personal benefit to the individual defendants resulting from the

fraud."[72]  Specifically, insufficient motives include "the desire for the corporation

to appear profitable and . . . the desire to keep stock prices high to increase officer

compensation."[73]  Courts have also rejected as insufficient allegations that a

company desired to inflate stock as a method of maintaining its credit rating.[74]

On the other hand, the desire "to inflate stock prices while

[defendants] sold their own shares" may support a viable claim.[75]  Some courts

---

[71]    *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994).

[72]    *Kalnit,* 264 F.3d at 139.

[73]    *Id.  Accord Acito*, 47 F.3d at 54 ("Plaintiffs' allegation that defendants
were motivated to defraud the public because an inflated stock price would
increase their compensation is without merit.  If scienter could be pleaded on that
basis alone, virtually every company in the United States that experiences a
downturn in stock price could be forced to defend securities fraud actions").
Similarly, it is insufficient to allege that defendants desired to protect their
executive compensation and the prestige they enjoyed as corporate officers.  *See
Shields*, 25 F.3d at 1130.

[74]    *See San Leandro Emergency Med. Group Profit Sharing Plan v.
Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996).

[75]    *Kalnit*, 264 F.3d at 139.  *Accord Novak*, 216 F.3d at 307 (same);
*Shields*, 25 F.3d at 1128 (same).  "Insider sales may serve as evidence of motive,
but the plaintiff must allege that any such sales were unusual in some way."  *In re
Interpublic Sec. Litig.*, No. 02 Civ. 6527, 2003 WL 21250682, at *11 (S.D.N.Y.

-18-

have also found that a company's desire to inflate its stock price as a prelude to completing a stock-based acquisition of another company can support a scienter inference.[76]

Regarding the "opportunity" prong, courts often assume that corporations, corporate officers and corporate directors would have the opportunity to commit fraud if they so desired.[77] However, opportunity to commit fraud may not exist if the alleged scheme had no chance of succeeding.[78]

─────────────────

May 29, 2003). For example, sales could be unusual because they were extensive, and the amount of profit and the percentage of a defendant's holdings that were sold are also relevant to this inquiry. *See In re Worldcom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 412 (S.D.N.Y. 2003).

[76] *See Rothman v. Gregor*, 220 F.3d 81, 94 (2d Cir. 2000) (allegations that defendants inflated stock price with any eye towards acquiring another company helped support scienter inference, although court declined to decide whether such an allegation could support a scienter inference by itself); *In re Vivendi Universal, S. A. Sec. Litig.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) ("[s]cienter may be imputed, as is the case here, to defendants when defendants were motivated to inflate company stock prices as a means to effectuate a specific acquisition that would not otherwise be possible without fraudulently inflating stock prices").

[77] *See In re Time Warner Sec. Litig.*, 9 F.3d at 269 (assuming that defendants had opportunity to manipulate their company's stock); *see also Kalnit v. Eichler*, 99 F. Supp. 2d 327, 335 (S.D.N.Y. 2000) (same); *High View Fund, L.P.*, 27 F. Supp. 2d at 427 (same).

[78] *See Shields*, 25 F.3d at 1120 (the complaint "fails to allege a sufficient opportunity to derive a benefit from the alleged misstatements and nondisclosures: the ordinary course of bank business would lead to [discovery of the misstatements], as it did").

## ii.    Conscious Misbehavior or Recklessness

When plaintiffs have failed to plead motive and opportunity, "it is still possible to plead scienter by identifying circumstances indicating conscious behavior [or recklessness] by defendant, though the strength of the circumstantial allegations must be correspondingly greater."[79]  Conscious misconduct is relatively easy to identify, "since it encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information . . . or knowing sale of a company's stock at an unwarranted discount."[80]

However, "[r]ecklessness is harder to identify with . . . precision and consistency."[81]  To sufficiently allege recklessness, the facts must "approximate an actual intent to aid in the fraud being perpetrated."[82]  Plaintiff must allege facts showing that the defendants' conduct was "highly unreasonable, representing an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been

---

[79]    *Kalnit*, 264 F.3d at 142 (quotation and citation omitted).

[80]    *Novak*, 216 F.3d at 308 (citation omitted).

[81]    *Id.*

[82]    *Chill v. General Elec. Co.,* 101 F.3d 263, 269 (2d Cir. 1996) (quotation and citation omitted).

aware of it."[83]  Recklessness is typically shown in one of two ways; plaintiff must

"specifically allege[] defendants' knowledge of facts or access to information

contradicting their public statements," or "allege[] facts demonstrating that

defendants failed to review or check information that they had a duty to monitor, or

ignored obvious signs of fraud."[84]

### 3.    Causation

To maintain a claim for securities fraud, a plaintiff must also plead

both (1) that it relied upon defendant's allegedly fraudulent conduct in purchasing

or selling securities, and (ii) that defendant's conduct caused, at least in part,

plaintiff's loss.[85]  These two elements are known, respectively, as "transaction

causation" and "loss causation."[86]

---

[83]     *Rothman,* 220 F.3d at 90 (citing *Novak*, 216 F.3d at 308).  The Second
Circuit has also noted that "[a]n egregious refusal to see the obvious, or to
investigate the doubtful, may in some cases give rise to an inference of . . .
recklessness."  *Chill*, 101 F.3d at 269 (quotation and citation omitted).

[84]     *Novak,* 216 F.3d at 308.

[85]     *See Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 179 (2d Cir.
2001).

[86]     "Transaction causation is generally understood as reliance."  *Id.* at
186.  A rebuttable presumption of transaction causation may be established under
the "fraud on the market" theory, even where a plaintiff was unaware of the
fraudulent conduct at the time of the purchase or sale:

'The fraud on the market theory is based on the hypothesis that, in

Loss causation refers to the requirement that a plaintiff demonstrate

that the fraudulent scheme caused her loss.[87]  In the case of a 10b-5 action alleging

a material misstatement or omission, loss causation generally requires a plaintiff to

show that her investments would not have lost value if the facts that defendants

---

> an open and developed securities market, the price of a company's
> stock is determined by the available material information regarding
> the company and its business. . . . Misleading statements will
> therefore defraud purchasers of stock even if the purchasers do not
> directly rely on the misstatements.  .  .  .  The causal connection
> between the defendants' fraud and the plaintiffs' purchase of stock
> in such a case is no less significant than in a case of direct reliance
> on misrepresentations.'

*Basic, Inc.,* 485 U.S. at 241-42 (alterations in original) (quoting *Peil v. Speiser*,
806 F.2d 1154, 1160-61 (3d Cir. 1986)).

Pleading that defendants perpetrated a fraud on the market, therefore,
fulfills a plaintiff's transaction causation pleading requirement.

[87]    *See Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 716-17 (2d Cir.
1980) (Meskill, J., dissenting) (noting that "a fundamental principle of causation
which has long prevailed under the common law of fraud and which has been
applied to comparable claims brought under the federal securities acts . . . is, quite
simply, that the injury averred must proceed directly from the wrong alleged and
must not be attributable to some supervening cause.").  In 1995, Congress codified
the loss causation requirement in the PSLRA:

> In any private action arising under this chapter, the plaintiff shall
> have the burden of proving that the act or omission of the
> defendant alleged to violate this chapter caused the loss for which
> the plaintiff seeks to recover damages.

15 U.S.C. § 78u-4(b)(4).

misrepresented or omitted had been known.[88]

A plaintiff cannot satisfactorily allege loss causation simply by alleging that she purchased securities at artificially inflated prices. In *Dura Pharmaceuticals, Inc. v. Broudo*,[89] the Supreme Court rejected the Ninth Circuit's permissive pleading standard for loss causation, which required only that a plaintiff allege that she had bought a security at an artificially inflated price.[90] The Court noted that:

> [I]t should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind. At the same time, allowing a plaintiff to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about harm of the very sort the statutes seek to avoid.[91]

Most recently, the Second Circuit has held that a plaintiff must allege that "the loss be foreseeable and [ ] the loss be caused by the materialization of the

---

[88]    *See, e.g., Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 96 (2d Cir. 2001).

[89]    125 S.Ct. 1627, 1630 (2005).

[90]    *See Broudo v. Dura Pharms., Inc.*, 339 F.3d 933, 938 (9th Cir. 2003).

[91]    *Dura*, 125 S.Ct. at 1634.

-23-

concealed risk."[92]  This Court's recent decision in *In re Initial Public Offering*

*Securities Litigation* describes in detail the Second Circuit's loss causation

standard:

> Where the alleged misstatement conceals a condition or event
> which then occurs and causes the plaintiff's loss, it is the
> materialization of the undisclosed condition or event that causes
> the loss.  By contrast, where the alleged misstatement is an
> intentionally false opinion, the market will not respond to the truth
> until the falsity is revealed — i.e. a corrective disclosure.[93]

## IV.   DISCUSSION

### A.   Plaintiffs Fail to Plead a Cause of Action Against Jugal Taneja

Plaintiffs have sued Jugal Taneja, the Chairman of GeoPharma's

Board of Directors.[94]  But plaintiffs do not make any specific allegations against

him anywhere in the Complaint.[95]  Instead, plaintiffs invoke the "group pleading

doctrine," which allows a plaintiff to rely on "a presumption that statements in . . .

press releases, or other group-published information, are the collective work of

---

[92]     *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)
(emphasis omitted).

[93]     No. 21 MC 92, 2005 WL 1529659, at *6 (S.D.N.Y. June 28, 2005)
(citations omitted).

[94]     *See* Complaint ¶ 7(a).

[95]     For that matter, Jugal Taneja is not mentioned at all in the Complaint
except to name him as a defendant.  It is clear that a mention of "defendant Taneja"
at Complaint ¶ 53 refers to Mihir Taneja.

those individuals with direct involvement in the everyday business of the company."[96]

However, this doctrine is "extremely limited in scope, applying only to clearly cognizable corporate insiders with active daily roles in the relevant companies or transactions."[97]  To be sure, the doctrine may apply to outside directors who "although almost by definition [are] excluded from the day-to-day management of a corporation, can fall within the group pleading presumption when, by virtue of their status or a special relationship with the corporation, . . . have access to information more akin to a corporate insider."[98]

Plaintiffs fail to allege that Jugal Taneja has a special relationship with GeoPharma.  A bare allegation that Jugal Taneja is Chairman of the Board, in the absence of any specific allegation that he played a role in the preparation of the December 1 Release, or otherwise took part in the day-to-day operations of

---

[96] *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 142 (S.D.N.Y. 1999) (quotation and citation omitted).

[97] *Polar Int'l Brokerage Corp. v. Reeve*, 108 F. Supp. 2d 225, 237 (S.D.N.Y. 2000).

[98] *In re Independent Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 767-68 (S.D.N.Y. 2001), abrogated on other grounds by *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d at 352 (discussing pleading standard for claims under section 15 of the Securities Act).

GeoPharma, does not justify applying the group pleading doctrine.[99]  Therefore, all

claims against him are dismissed.[100]

## B.    Actionably Misleading Statements

---

[99]    *See Dresner v. Utility.com, Inc.*, No. 01 Civ. 7221, 2005 WL
1185636, at *13 (S.D.N.Y. May 18, 2005) (allegations against "non-insider"
defendants fail to satisfy Rule 9(b) when there is no specific allegation to suggest
that those defendants "took part in the preparation" of misstatements at issue, nor
any allegation that non-insider defendants "acted like corporate insiders"); *cf.
Shanahan v. Vallat*, No. 03 Civ. 3496, 2003 WL 2937805, at *4 (S.D.N.Y. Dec.
19, 2004) (defendant Chairman of the Board within group pleading doctrine
because plaintiffs sufficiently pled that he was involved in the everyday business
of defendant company); *In re Independent Energy Holdings*, 154 F. Supp. 2d at
768 (citation omitted) (group pleading doctrine covers an outside director who as
"a founder of the Company and its largest individual shareholder . . . may be able
to influence the company").

[100]    Plaintiffs' opposition brief offers additional facts concerning
Jugal Taneja in an attempt to justify application of the group pleading doctrine.
*See* Lead Plaintiffs' Opposition to Defendants' Motion to Dismiss the
Consolidated Amended Class Action Complaint ("Pl. Opp.") at 23 n.18 (asserting
that Jugal Taneja is a large GeoPharma shareholder; is the father of defendant
Mihir Taneja; and signed a form 10-K referenced in the Complaint); *but see id.* at
22-23 ("Plaintiffs submit that [the allegations in the Complaint] alone are sufficient
to apply the group pleading doctrine to Jugal Taneja.")  However, none of these
new facts appear in the Complaint, which cannot be amended by the brief in
opposition to a motion to dismiss.  *See, e.g., In re Livent, Inc. Noteholders Sec.
Litig.*, 151 F. Supp. 2d 371, 432 (S.D.N.Y. 2001).

        In any case, it is unlikely that these new facts would establish that
Jugal Taneja had a hand in the preparation of the December 1 Release, *see
Dresner*, 2005 WL 1185636, at *13, or had a special relationship with GeoPharma
giving rise to an inference that he had access to information akin to a corporate
insider, *see In re Independent Energy Holdings*, 154 F. Supp. 2d at 767-68.

Plaintiffs allege three distinct misstatements in the December 1 Release. *First*, plaintiffs allege that the statement that GeoPharma "received approval from the [FDA] for Mucotrol, a prescription product for the management of oral mucositis/stomatitis" is misleading because it failed to specify that, despite GeoPharma's earlier statements, Mucotrol was approved as a medical device and not as a drug.[101] *Second*, the Release allegedly "materially overstated" the market potential for Mucotrol.[102] *Third*, plaintiffs allege that GeoPharma had a duty to disclose that Mucotrol had existing competition in the field of medical devices.[103]

### 1.    Mucotrol as a "Prescription Product"

Defendants first note that plaintiffs cannot allege that the description of Mucotrol as a "prescription product" is literally false.[104]   After all, Mucotrol is in fact a product available by prescription.[105]   But plaintiffs actually allege that the term "prescription product" in the December 1 Release could be interpreted by a reasonable investor as referring to a new drug, given the context created by

---

[101]    *See* Complaint ¶ 49(a).

[102]    *See id.* ¶¶ 49(c), (d).

[103]    *See id.* ¶ 49(b).

[104]    *See* Def. Mem. at 7.

[105]    *See* Complaint Ex. B (attachment to the FDA's 501(k) approval letter indicates that Mucotrol is for "PRESCRIPTION USE").

defendants' earlier statements concerning GeoPharma's ongoing development of a new *drug* to treat mucositis, as well as the context of the rest of the December 1 Release, which spoke of a vast market potential for Mucotrol more consistent with a new drug than a new medical device.[106]

Defendants' argument that the December 1 Release's reference to a "prescription product" was not misleading reduces to the proposition that a reasonable investor would have understood the December 1 Release as an *update* of earlier GeoPharma statements which had referred to Mucotrol as a drug. In particular, defendants make much of the fact that the December 1 Release describes Mucotrol as a product that "manages" mucositis - a verb that to a reasonable investor should denote a medical device, as opposed to a drug that "treats" a disease.[107] Therefore, defendants argue that a reasonable investor could not be misled by the December 1 Release into thinking that GeoPharma had gained approval of a new drug, because such an investor would necessarily "have to recognize that the December 1 Press Release, in the most significant way, was *not*

---

[106]    *See id.* ¶¶ 34, 36, 49(a), 61; Pl. Opp. at 8-11.

[107]    *See* Def. Mem. at 8. In fact, defendants note that even plaintiffs' Complaint explains that the salient difference between a "drug" and a "medical device" is that the former "treats" while the latter only "manages." *Id.* (citing Complaint ¶¶ 43, 46, 49(a)).

consistent with the earlier statements about Mucotrol."[108]

This case is similar to *In re Ribozyme Pharmaceutical, Inc. Securities Litigation,* a case on which plaintiffs rely.[109]  In that case, a drug company defendant announced that a drug it was developing had entered Phase II clinical trials.[110]  Defendant subsequently issued a media advisory claiming that the same drug had "[made] cancer drug history," and asserting that the drug had taken "an important step forward," "making both clinical history and industry news."[111]

After this media advisory, the company's stock doubled in less than two hours.[112]  But after trading was halted, defendants disclosed that the media advisory merely referred to the previously-disclosed commencement of Phase II trials.[113]  At the motion to dismiss stage, the court accepted plaintiffs' argument that this media advisory could be actionably misleading; in light of defendants'

---

[108]    Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss the Consolidated Class Action Complaint ("Reply Mem.") at 6.

[109]    119 F. Supp. 2d 1156 (D. Colo. 2000); *see also* Pl. Mem. at 9-10 (discussing *In re Ribozyme*).

[110]    *See In re Ribozyme*, 119 F. Supp. 2d at 1160.

[111]    *Id.*

[112]    *See id.*

[113]    *See id.*

earlier announcements it was reasonable to interpret the advisory as announcing

additional progress beyond the previously-disclosed Phase II trials.[114]

      Defendants are correct that a company is not required to use the

clearest language possible in its public statements.[115] Even so, a reasonable

investor could have been misled by failing to absorb the fine distinction between

the terms "drug" and "prescription product."[116] Therefore, plaintiffs have properly

alleged that the use of a rather vague term such as "prescription product" in the

December 1 Release, given the context of GeoPharma's previous statements, could

---

[114]     *See id.* at 1162.

[115]     *See* Def. Mem. at 8 ("[w]hile plaintiffs may have preferred that the Company had used different language – describing Mucotrol as a 'medical device', for example – this preference does not transform an accurate description into a misleading one"); *see also Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1069 (5th Cir. 1994) (defendants who described a contract as a "particular success" under no duty to use a different adjective that plaintiffs asserted would be more accurate); *cf. In re American Express Sec. Litig.*, No. 02 Civ. 5533, 2004 WL 632750, at *9 (S.D.N.Y. Mar. 31, 2004) ("where a defendant fully discloses the material facts, plaintiffs cannot predicate a Rule 10b-5 claim on the defendant's failure to disclose those facts in critical terms.").

[116]     *See Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002) ("a claim fails to state a claim of securities fraud if *no reasonable investor* could have been misled about the nature of the risk when he invested.") (emphasis in original); *cf. Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1097 (1991) (If it would take a[n] . . . analyst to spot the tension between [a true statement and a deceptive one], whatever is misleading will remain materially so, and liability should follow . . . [t]he point of a proxy statement, after all, should be to inform, not to challenge the reader's critical wits.").

be objectively misleading.

## 2. Statement of "Market Potential"

The December 1 Release contained the following statement:

> Mucositis afflicts approximately 40% of patients receiving cancer chemotherapy and 75% of bone marrow transplant recipients as well as 100% of patients receiving radiotherapy for cancer of the head and neck. It is estimated that approximately 300,000 cancer patients in the U.S. suffer from mucositis associated with cancer treatments. *Based on this, the estimated U.S. oncology market potential for Mucotrol sales are between $75 million and $300 million per annum and the estimated global market is between $250 million and $1 billion per annum.*[117]

Defendants argue that the statement is not actionable because it qualifies for the protection of the PSLRA's safe-harbor for forward-looking statements.[118] This safe harbor protects forward-looking statements if one of three conditions are met: 1) the forward-looking statement is identified as such and accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement;" 2) the statement is "immaterial"; or 3) the plaintiff fails to prove that the statement was made with actual knowledge that the statement

---

[117]    Complaint ¶ 47 (emphasis added).

[118]    *See* Def. Mem. at 12-13.  Defendants also argue that the statement is a general expression of optimism, immaterial as a matter of law.  *Id.* at 11.

was false or misleading.[119]

Fairly read as a statement of potential revenues Mucotrol might garner, the market potential statement qualifies as a forward-looking statement under the PSLRA, thereby warranting protection as long as it meets one of the three statutory conditions.[120]  Neither of the first two conditions are met.[121]  But, for the reasons discussed later in this Opinion, plaintiffs have failed to plead that defendants had actual knowledge that the market potential statement was false.[122]

Plaintiffs attempt to avoid the PSLRA safe harbor by characterizing the market potential statement as a statement of historical fact.  "At any point in

---

[119]     *See* 15 U.S.C. § 78u-5(c)(1).

[120]     *See* 15 U.S.C. § 78u-5(i)(1)(A) (the term forward-looking statement means, *inter alia*, "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items").

[121]     The market potential statement is clearly material, and plaintiffs are correct that the cautionary language present in the December 1 Release was mere boilerplate that did not convey "substantive information about factors that realistically could cause results to differ materially from those projected."  Pl. Opp. at 14 (quotation and citation omitted).

[122]     *See infra* Section IV.C.2 (discussing whether plaintiffs acted with conscious knowledge or recklessness that their statements were false).  *See also High View Fund, L.P.*, 27 F. Supp. 2d at 427 n.3 (holding that when plaintiffs fail to plead scienter, there is no need to determine whether plaintiffs have met the "marginally higher" standard for pleading actual knowledge of the falsity of a forward-looking statement under the PSLRA).

time the 'market potential' of a product is a fixed number – whether or not knowable with certainty."[123]  But if the market potential statement is *not* a revenue projection for Mucotrol, then it could only be interpreted as an estimate of the total market for *all* products that treat or manage mucositis, whether or not the products are manufactured by GeoPharma.  If this is the case, plaintiffs have not pled that the statement is false.  As defendants note, "given the number of people who suffer from mucositis, as set forth in the December 1 Press Release, it is entirely reasonable to assume that there is at least $75 million out in the market to be spent on products addressing the affliction."[124]  The statement is either a protected forward-looking statement, or it is a statement of historical fact that is not alleged to be false.  Either way, for the reasons set forth more fully below, the market potential statement is not actionable.

### 3.    Non-Disclosure of Competitors' Products

Plaintiffs assert that, in light of earlier company statements in connection with Mucotrol to the effect that no effective treatment for mucositis is available, GeoPharma had a duty to disclose competitor products as a part of its general duty to update statements that may have become misleading as a result of

---

[123]    Pl. Opp. at 13.

[124]    Reply Mem. at 8-9.

intervening events.[125]  But plaintiffs are not claiming that those earlier statements

are false, and there is normally no duty to disclose the existence of competitors.[126]

At most, as plaintiffs themselves recognize, the failure to disclose the existence of

competition is not a separate misstatement or omission, but merely an example of

how defendants could have worded the December 1 Release differently so as to

avoid misleading investors on the central issue of whether Mucotrol was a drug or

a medical device.[127]  Therefore, this alleged omission is not actionable.

## C.    Scienter

While plaintiffs have adequately alleged that the December 1

Release's description of Mucotrol as a "prescription product" could be objectively

misleading, "a statement does not become actionable simply by virtue of being

false (or otherwise misleading), — the other elements of fraud, such as scienter and

---

[125]    *See* Pl. Opp. at 16.

[126]    *See Castillo v. Dean Witter Discover & Co.*, No. 97 Civ. 1272, 1998
WL 342050, at *8 (S.D.N.Y. June 25, 1998); *see also In re Donald J. Trump
Casino Sec. Litig.*, 7 F.3d 357, 375-76 (3d Cir. 1993) ("[t]he federal securities laws
do not ordain that the issuer of a security compare itself in myriad ways to its
competitors, whether favorably or unfavorably").

[127]    *See* Pl. Opp. at 16 ("Had Defendants disclosed [Mucotrol's]
competitors . . . investors would have some notice that, among other things: (i)
Mucotrol was really a device and not a new revolutionary drug; (ii) its market
potential, as estimated by GeoPharma, had no reasonable basis in fact, and (iii) its
potential sales were limited and could best be estimated by looking to its
established competition.").

reliance, must also be present."[128]  For the following reasons, plaintiffs' allegations

must be dismissed because they have failed to "giv[e] rise to a strong inference that

the defendant acted with the required state of mind."[129]

### 1.    Motive and Opportunity

### a.    GeoPharma

Plaintiffs allege that GeoPharma's motive to inflate its share price was

to force some of its noteholders and preferred shareholders to accept shares of its

common stock, so GeoPharma could avoid making principal, interest and dividend

payments pursuant to those financing arrangements.[130]  GeoPharma could

accomplish this if its stock traded above certain levels for either five or ten days,

depending on the particular security purchase agreement in question.[131]  In short,

plaintiffs allege that "[d]efendants embarked on a scheme which would enable

them to reduce the Company's monthly cash payments [for interest on the

---

[128]    *Fogarazzo*, 341 F. Supp. 2d at 294.

[129]    15 U.S.C. § 78u-4(b)(2).

[130]    *See* Complaint ¶¶ 33, 62.

[131]    *See id.* ¶¶ 27, 29-30, 32; *see also supra* notes 47-49 and
accompanying text.

notes]."[132]

These allegations are insufficient for a fundamental reason – the alleged scheme could not possibly have succeeded.[133]  The FDA approval of Mucotrol was public information, and it would have been obvious *ex ante* to defendants that financial reporters and/or analysts would contact the FDA immediately after the December 1 Release (which is of course what occurred).[134] There was never the slightest chance that GeoPharma stock could be inflated by the

---

[132]    *Id.* ¶ 33; *see also id.* ¶ 62 ("[d]efendants were motivated to engage in the fraudulent scheme detailed herein in order to force the conversion of GeoPharma's debt and equity financing into common stock . . . in order to avoid making substantial monthly payments on its Term Note and preferred stocks").

[133]    It is a bit unclear whether patent impossibility of the alleged scheme goes to the "motive" or the "opportunity" prong.  *See In re Time Warner Inc. Sec. Litig.*, 794 F. Supp. 1252, 1260 (S.D.N.Y. 1992), *rev'd on other grounds*, 9 F.3d 259 (2d Cir. 1993) (emphasis added) (no *motive* for committing fraud when alleged scheme "could not rationally have been expected to succeed"); *but see Shields*, 25 F.3d at 1120 (emphasis added) (the complaint "fails to allege a sufficient *opportunity* to derive a benefit from the alleged misstatements and nondisclosures: the ordinary course of bank business would lead to [discovery of the misstatements], as it did").

[134]    *See* Complaint ¶¶ 50.  In *White v. H.R. Block, Inc.*, plaintiffs alleged that defendants misled investors by concealing the pendency of twenty large class-action lawsuits against defendants, "by either silence or anodyne references [to the litigation] in Block's public filings and press releases."  No. 02 Civ. 8965, 2004 WL 1698628, at *8 (S.D.N.Y. July 28, 2004).  The court found that plaintiffs had not pled opportunity as, given the "trove" of public information on the litigation independently available, the "prospect of achieving concrete benefits by the means alleged" was far from "likely."  *Id.*

-36-

December 1 Release for anywhere close to the five days needed to carry out the alleged scheme, and therefore plaintiffs cannot raise a strong inference of scienter on this basis.

Plaintiffs' motive allegations fail for another reason – courts in this Circuit have consistently held that allegations that a defendant was motivated to commit securities fraud by a desire to reduce its debt burden, or otherwise reduce borrowing costs, are insufficient to raise a scienter inference.[135] Plaintiffs' allegations that GeoPharma sought to reduce its cash outlays for debt service fall squarely into this category.[136]

Plaintiffs argue that the desire to inflate the stock to activate the conversion feature of GeoPharma's financing agreements is a valid motive because

---

[135]    *See, e.g., San Leandro*, 75 F.3d at 814 (rejecting motive allegations based on theory that an inflated stock price would maximize marketability of debt securities issued during class period: "We do not agree that a company's desire to maintain a high bond or credit rating qualifies as a sufficient motive for fraud in these circumstances, because [i]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.") (quotation and citation omitted).

[136]    *See In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478, 2003 WL 22801416, at *8-9 (S.D.N.Y. Nov. 25, 2003) (rejecting motive allegations based on company's desire to inflate stock in order to pay down debt); *see also Leventhal v. Tow*, 48 F. Supp. 2d 104, 115 (D. Conn. 1999) (rejecting motive allegations based on company's desire to inflate stock to get more favorable terms on certain stock-for-stock transactions and in the issuance of debentures).

it represents a "specific corporate transaction," citing cases where a company's desire to make a corporate acquisition with inflated stock was held to be a valid motive for scienter purposes.[137] But plaintiffs read these cases too broadly – they are in fact limited to the desire to carry out corporate *acquisitions*.[138] The Second Circuit has explained that the motive to acquire another company can support an inference of scienter because, unlike the motive to reduce borrowing costs, it is a motive not generally possessed by all corporations.[139] Plaintiffs fail to offer any convincing reason why the short-term or unusual nature of the debt arrangement in

---

[137]    Pl. Mem. at 20-21.

[138]    *See Rothman*, 220 F.3d at 93 (allegation that company used inflated stock price to make it less costly to acquire another company); *In re Time Warner Inc. Sec. Litig.*, 9 F.3d at 269-70 (allegation that defendants wanted to lessen dilutive effect of upcoming offering, and avoid jeopardizing talks with potential strategic alliance partners); *In re Vivendi Universal, S.A., Sec. Litig.*, 381 F. Supp. 2d at 185 (allegation that defendant wanted to use inflated stock to "acquire and continue acquiring" several companies); *Burstyn v. Worldwide Xceed Group, Inc.*, No. 01 Civ. 1125, 2002 WL 31191741, at *5 (S.D.N.Y. Sept. 30, 2002) (allegation that defendants' specific goal was to acquire companies).

        One court has defined this "specific acquisition" rule more broadly. *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001) (emphasis added) ("the artificial inflation of a stock price in order to achieve some more *specific goal* may satisfy the pleading requirement"). However, even in that case defendant's "specific goal" was to inflate its stock price to use it as currency for acquisitions. *See id.* at 327-28.

[139]    *See Rothman*, 220 F.3d at 93 (noting that "[a]lthough virtually every company may have the desire to maintain a high bond or credit rating . . . not every company has the desire to use its stock to acquire another company").

this case merits departure from the *San Leandro* rule.[140]

### b. Individual Defendants

There are no motive and opportunity allegations against the individual defendants. Typically, a plaintiff alleges that an individual traded in company stock after the stock was artificially inflated as a result of the scheme.[141] No such allegations are made in this case against any individual defendant.[142] For that matter, there are no allegations explaining how any of the individual defendants personally profited from the alleged scheme.[143] Moreover, a corporate motive (such as the desire to activate the conversion features of the securities purchase

---

[140] *Cf. In re 1993 Corning Sec. Litig.*, No. 93 Civ. 7015, 1996 WL 257603, at *6 (S.D.N.Y. May 15, 1996) (noting that *San Leandro* "attached no temporal limitation to its holding").

[141] *See Novak,* 216 F.3d at 308 (adequate motive generally arises from "the desire to profit from extensive insider sales"); *see also Stevelman*, 174 F.3d at 85 ("[p]erhaps the most persuasive allegation in the Amended Complaint is the fact that Bingham, along with other Alias officers, sold off large portions of his stockholdings during the period of the misrepresentations").

[142] *See also* Complaint ¶ 54 (media quotes defendants Mihir Taneja and Sekharam as reporting that neither sold personal holdings on December 1 or 2).

[143] *See, e.g., Kalnit,* 264 F.3d at 139 (plaintiffs must assert that individual defendants would receive a "concrete and personal benefit" from the alleged scheme).

agreements) cannot be ascribed to individual defendants.[144]  Therefore, plaintiffs

have not alleged scienter against the individual defendants through motive and

opportunity.

### 2.    Conscious Misbehavior/Recklessness

Defendants argue, in their reply brief, that because the alleged scheme

could not have succeeded, this alone precludes a finding of the required strong

inference of scienter, even when plaintiffs attempt to prove scienter by alleging

conscious misbehavior or recklessness.[145]  Defendants' novel argument has

merit.[146]  Conscious misbehavior is an intentional wrongful act.  Surely if such

---

[144]    *See In re Initial Public Offering Sec. Litig. (In re Rediff.com Sec.
Litig.)*, 358 F. Supp. 2d 189, 215 (S.D.N.Y. 2004) (in the absence of insider stock
sales by individual defendants, proposed acquisition by corporate defendant
insufficient by itself to establish motive for individual defendants).

[145]    *See* Reply Mem. at 1-3; *see also id.* at 3 n.1 ("Given the
incompatibility . . . between a finding of [scienter] and a recognition that
defendants obviously never could have expected the alleged scheme to have
succeeded, it therefore should not matter whether such intent is to be inferred from
motive and opportunity or recklessness.").

[146]    Examining the allegations separately under the rubrics of "motive and
opportunity" and "conscious misbehavior or recklessness" is unduly formalistic
and not required by the PSLRA, which merely directs a court to assess whether
plaintiff has raised a "strong inference" of scienter.  15 U.S.C. §78u-4(b)(2).  *Cf.
Novak*, 216 F.3d at 311 (discussing how enactment of the PSLRA affected prior
Second Circuit precedent concerning pleading of scienter; while prior case law
"may be helpful in providing guidance as to how the [PSLRA's] 'strong inference'
standard may be met . . .  litigants and lower courts need [not] and should not

alleged misbehavior is incapable of defrauding investors, that, in itself, negates the inference of intent to defraud.[147] The same must be true for allegations of reckless conduct. Reckless acts are highly unreasonable, representing an extreme departure from the standards of ordinary care. If the alleged reckless behavior is incapable of defrauding investors, that, too, negates any inference of intent to defraud.

In any case, plaintiffs' allegations of conscious misbehavior or recklessness fall far short of the required standard.[148] Plaintiffs allege that defendants were at least reckless in issuing the December 1 Release, because defendants knew that the FDA approval was for a medical device, not a drug.[149]

_____

employ or rely on magic words such as 'motive and opportunity'").

[147] Defendants cite an antitrust case, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), in which the Supreme Court rejected an inference of intent in a predatory pricing case, because the alleged scheme made little economic sense and was unlikely to eventually "pay off." *See id.* at 592-94. *Cf. id.* at 593 (citation omitted) ("courts should not permit factfinders to infer conspiracies when such inferences are implausible").

[148] *See Kalnit*, 264 F.3d at 142 ("[w]here motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater.").

[149] *See* Complaint ¶ 61; *see also id.* ¶ 42 (alleging that defendants did not disclose the nature of the FDA approval until December 2). Plaintiffs also make several conclusory allegations regarding defendants' knowledge or recklessness of the falsity of their statements, *see id.* ¶¶ 8, 9, 10, 60, 72, 73 which are of course insufficient to establish scienter under the standards of the PSLRA and Rule 9(b). *See, e.g., Shields*, 25 F.3d at 1129.

"When the December 1, 2004 press release was issued, Defendants knew or were extremely reckless in not knowing that they were misrepresenting material facts related to the corporation."[150] But even if the FDA approval letter could be said to have contradicted the December 1 Release in some sense, the FDA approval of Mucotrol was public information. Plaintiffs have cited no case, and I am aware of none, where a plaintiff adequately pled scienter based solely on the contradiction between *public* information and the company's public statements.[151] Cases in this Circuit assume that the contradictory information in question must be non-public.[152] Especially in light of plaintiffs' failure to put forward a plausible motive

---

In their memorandum of law, plaintiffs also put forward "an additional fact suggesting that Defendants' conduct went a step beyond extreme recklessness"; that the December 1 release was "carefully crafted to be internally ambiguous, describing [Mucotrol] as a 'prescription product' for the management of oral mucositis/stomatitis." Pl. Opp. at 19. However, plaintiffs offer no support for the proposition that a court can infer a strong inference of scienter from a suspiciously worded statement – which would be a vague standard at best.

[150] Pl. Opp. at 18 (quotation and citation omitted).

[151] *See White*, 2004 WL 1698628, at *8-10 (plaintiffs failed to plead scienter because, *inter alia*, defendant's misleading statements regarding pending litigation were contradicted only by publicly available court records).

[152] *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 76 ("[w]here the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled"); *see also Novak*, 216 F.3d at 308 ("Where plaintiffs contend defendants [as opposed to the general public] had access to contrary facts, they must specifically identify the reports or statements containing this information").

for the alleged scheme, I cannot conclude that defendants' statements, even though confusingly worded, exhibited "an extreme departure from the standards of ordinary care" necessary to support an inference of scienter.[153]

### D.    Loss Causation[154]

Defendants also dispute plaintiffs' allegations of loss causation.  *First*, defendants note that GeoPharma's stock price actually increased after the alleged corrective disclosures (the December 2 Press Release and the December 2 conference call), reaching a high at one point of $9.58.[155]  *Second*, defendants argue that any artificial inflation during the class period cannot be attributed to GeoPharma's alleged misstatements, as opposed to other possible causes such as the incorrect news reports by Reuters and Dow Jones on the morning of December

---

[153]    *Novak*, 216 F.3d at 308 (quotation and citation omitted).  To the extent that the December 1 Release could have been more clear, plaintiffs have not pled more than that GeoPharma was negligent.  *Cf. Kalnit v. Eichler*, 99 F. Supp. 2d 327, 343 n.15 (S.D.N.Y. 2000) ("where the materiality of [information not disclosed by defendants] is highly debatable at best . . . the failure to disclose that release simply cannot lead to a finding of recklessness.").

[154]    To establish transaction causation, plaintiffs invoke the fraud on the market theory to support a presumption of reliance, alleging that GeoPharma shares trade in an efficient market.  *See* Complaint ¶¶ 57, 63-64.  Defendants do not dispute the applicability of the presumption.

[155]    *See* Def. Mem. at 23-24.

1 that GeoPharma had gained approval of a "drug".[156]

       Leaving aside for the moment that plaintiffs have failed to adequately allege scienter, their loss causation allegations are sufficient. Defendants overstate the nature of plaintiffs' burden at this stage of the proceedings when they argue that plaintiffs must exclude all other possible causes of the artificial inflation.[157] To the contrary, plaintiffs must only allege a false or misleading statement,[158] which caused an artificial inflation of the stock,[159] followed by a dissipation of that inflation after corrective disclosures were made.[160] The corrective disclosure in this case involved the correction of the misapprehension, fostered by the December 1 Release, that GeoPharma had gained approval of a new drug instead of a new medical device. Therefore, the Complaint puts defendants on sufficient notice of

---

      [156]    *See id.* at 24; *see also* "GeoPharma Drug for Mouth Inflammation Approved," Reuters, December 1, 2004, Ex. 3 to 6/6/05 Declaration of Robert A. Scher, counsel to defendant ("Scher Aff."); "Before the Bell: Humana Up; Sees Hitting Top End of Views", Dow Jones Newswires, December 1, 2004, Ex. 4 to Scher Aff.

      [157]    *See* Def. Mem. at 24 ("to the extent that there was any 'artificial inflation' of the Company's stock price, plaintiffs cannot support an inference that it was the December 1 Press Release, as opposed to the inaccurate news reports, that proximately caused such artificial inflation.").

      [158]    *See* Complaint ¶¶ 47, 49(a).

      [159]    *See id.* ¶ 48.

      [160]    *See id.* ¶¶ 50, 53.

the "causal connection that the plaintiff has in mind."[161]

### E.    Section 20(a)

Plaintiffs also bring allegations against the individual defendants under section 20(a) of the Exchange Act.[162]  However, a primary violation of section 10(b) is a prerequisite to finding control person liability under section 20(a).[163]  Accordingly, as plaintiffs have failed to adequately plead scienter, the control person allegations are dismissed.

### F.    Leave to Amend

Plaintiffs have requested leave to amend the Complaint in the event of dismissal.[164]  Pursuant to Rule 15(a), leave to amend a complaint "shall be freely

---

[161]    *Dura,* 125 S. Ct. at 1634.

[162]    Complaint ¶¶ 78-81.  Section 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78t(a), states, in pertinent part:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly induce the act or acts constituting the violation or cause of action.

[163]    *See Rombach*, 355 F.3d at 177-78; *see also In re Parmalat Sec. Litig.*, – F. Supp. 2d –, 2005 WL 1994016, at *5 (S.D.N.Y. Aug. 17, 2005) (same).

[164]    *See* Pl. Opp. at 25 n.22.

freely granted when justice so requires."[165]  Moreover, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead."[166]  Plaintiffs are therefore granted leave to replead within twenty days of this Opinion and Order.

## V.    CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted, without prejudice, with leave to replead within twenty days of receipt of this Opinion and Order.  The Clerk is directed to close this motion [Docket #40].

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:  New York, New York
         September 30, 2005

---

[165]    Fed. R. Civ. P. 15(a).

[166]    *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir. 1991).

## - Appearances -

*Counsel for Plaintiffs:*

Samuel H. Rudman, Esq.
David A. Rosenfeld, Esq.
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
200 Broadhollow Road, Suite 406
Melville, NY 11747
(631) 367-7100

Kip B. Shuman, Esq.
DYER & SHUMAN, LLP
801 East 17th Avenue
Denver, CO 80218-1417
(303) 861-3003

*Counsel for Defendants:*

Robert A. Scher, Esq.
Jeremy L. Wallison, Esq.
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
(212) 682-7474