**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
In re GEOPHARMA, Inc. SECURITIES              :
LITIGATION                                    :          **OPINION AND**
                                              :          **ORDER**
THIS DOCUMENT RELATES TO:                     :
ALL ACTIONS                                   :          04 Civ. 9463 (SAS)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

This case presents a difficult but interesting question. When a

defendant makes a false statement in connection with the purchase or sale of

securities, that statement is only actionable if the defendant acted with a culpable

state of mind. The easiest case is when a plaintiff alleges that a defendant

intentionally made a demonstrably false statement. When this allegation is made,

a court need not consider whether a defendant acted recklessly or was merely

negligent.

Moving up the scale, a plaintiff can also maintain a securities fraud

action premised on a defendant's recklessness. Courts have defined recklessness

as conduct that is "highly unreasonable, representing an extreme departure from

the standards of ordinary care to the extent that the danger was either known to the

-1-

defendant or so obvious that the defendant must have been aware of it."[1] In such cases, intent is sufficiently pled when a plaintiff alleges that a defendant had access to information contradicting the false statement, failed to check information it had a duty to monitor, or ignored obvious signs of fraud.[2] Here, too, a court is not required to analyze whether the conduct at issue was negligent as opposed to reckless, because such allegations preclude a finding of negligence.

The issue becomes more difficult when considering a misleading statement, as opposed to a false statement. A "misleading" statement is one that is accurate and truthful – but only as far as it goes. Even a literally true statement becomes misleading when it omits material information that could cause a reasonable investor to be misled about the nature of the investment in question.[3]

---

[1]     *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (citation omitted); *see also Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (quotation and citation omitted) (recklessness must "approximate an actual intent to aid in the fraud being perpetrated").

[2]     *See Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).

[3]     *See McMahan & Co. v. Wherehouse Entm't., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) ("[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers"); *see also Fogarazzo v. Lehman Bros.*, 341 F. Supp. 2d 274, 294 (S.D.N.Y. 2004) (technically accurate statement can be actionable when material omissions render the statement a "half-truth"); *cf.*

-2-

Of course, such a statement is only actionable when the defendant acted with the requisite intent. It is entirely possible for a defendant to make an honest but negligent mistake in judging how much detail needs to be included in public statements in order to avoid misleading the market. The purpose of section 10(b) and Rule 10b-5 is to punish knowing fraud or reckless behavior, not mistakes that arise from negligent or even grossly negligent behavior.[4]

Thus, in such cases it is especially important to rigorously apply the standard for pleading intent, because defendants should not be required to incur litigation expenses every time an aggrieved investor claims that an accurate statement was rendered misleading based on the absence of additional information.[5] Similarly, if courts are too quick to infer culpability whenever

---

*Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002) (claim of securities fraud not stated if "*no reasonable investor* could have been misled about the nature of the risk when he invested.") (emphasis in original).

[4]     *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197-99 (1976) (rejecting the view that section 10(b) and Rule 10b-5 reach negligent behavior); *In re Livent Noteholders Sec. Litig.*, 148 F. Supp. 2d 331, 349-50 (S.D.N.Y. 2001) (citation omitted) (even gross negligence not covered by Rule 10b-5).

[5]     *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997) (Alito, J.) ("Public companies make large quantities of information available . . . as a result of both mandatory disclosure requirements and self-initiated voluntary disclosure. Large volumes of disclosure make for a high likelihood of at least a few negligent errors. To allow plaintiffs and their attorneys to subject companies to wasteful litigation based on the detection of a few

investors are confused by a defendant's statement, the focus of the intent inquiry could shift from that defendant's state of mind to public perceptions.

The question addressed in this Opinion, then, is how a court should determine whether the alleged failure to disclose additional information is intentional, reckless, or negligent, when the alleged misleading statement is literally true. The long answer is found by reading the entire Opinion. The short answer is that a court must consider the viability of the alleged scheme to defraud, the entire alleged misstatement (not just certain phrases), the context in which the statement was made, the public's access to additional information, the defendant's response to any market confusion resulting from the alleged misstatement, and any other indicia that the defendant acted with fraudulent intent. If all of these factors are given full consideration, the mist created by creative counsel dissipates and the intent, or lack of it, is revealed.

## II. BACKGROUND

On September 30, 2005, I dismissed this putative class action brought on behalf of certain purchasers of common stock in GeoPharma, Inc.

---

negligently made errors found subsequent to a drop in stock price would be contrary to the goals" of Federal Rule of Civil Procedure 9(b), which mandates that fraud be alleged with particularity).

("GeoPharma"), a publicly-traded pharmaceutical company, without prejudice.[6]
Plaintiffs have now filed an Amended Complaint, again alleging violations of
sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5
promulgated thereunder by the Securities and Exchange Commission ("SEC").[7]
All defendants again move to dismiss.

This suit arises from a December 1, 2004 GeoPharma press release
(the "December 1 Release"), announcing Food and Drug Administration ("FDA")
approval of Mucotrol, a new product for the treatment of mucositis.[8]  In pre-class
period statements during the summer of 2004, GeoPharma had disclosed to
investors that it was developing a "drug" to fight mucositis.  However, when
GeoPharma applied for FDA approval of this product, it sought approval for a less
lucrative "medical device."  GeoPharma obtained approval for its medical device
on November 24, 2004, and disclosed this approval in the December 1 Release.
But in the release, GeoPharma referred to Mucotrol as neither a drug nor a medical

---

[6]     See In re GeoPharma, Inc. Sec. Litig., 399 F. Supp. 2d 432 (S.D.N.Y.
2005) ("September 30 Opinion" or "GeoPharma").  Familiarity with this Opinion
is assumed.

[7]     See 15 U.S.C. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10(b)(5).

[8]     Mucositis is an inflammation of the mucosa in the mouth, caused by
chemotherapy and radiation.

device, instead employing the term "prescription product."

Although Mucotrol is in fact a product available by prescription, investors apparently believed that GeoPharma obtained approval of a new *drug*, and immediately drove GeoPharma's stock to its highest price ever. But within hours of the December 1 Release, the FDA made clear that GeoPharma had merely obtained approval for a medical device. By the evening of December 2, GeoPharma's stock dropped back to its pre-Release price, and plaintiffs filed their first suit later that day.

## III.   THE AMENDED COMPLAINT

The Amended Complaint sets forth similar allegations as the previously-dismissed Complaint. The allegations were detailed in the September 30 Opinion,[9] but I will briefly outline the pertinent facts.

The putative class period is December 1, 2004 through December 2, 2004.[10] In addition to the Company, plaintiffs name three individual defendants: President Kotha S. Sekharam, CEO Mihir K. Taneja, and Chairman of the Board

---

[9]      *See GeoPharma*, 399 F. Supp. 2d at 435-40.

[10]     *See* Second Amended Class Action Complaint for Violations of Federal Securities Laws ("Complaint") ¶ 15.

of Directors Jugal Taneja.[11]  All three defendants held these positions during the

putative class period.[12]

### A.  Pre-Class Period Statements Regarding Mucotrol

On June 29, 2004, GeoPharma disclosed that it was conducting

"formulation work" and "preliminary double blind placebo controlled clinical

studies" on a patent-pending drug to treat mucositis.[13]  GeoPharma again referred

to a mucositis drug in a July 13, 2004 press release, stating that it had completed a

clinical study to evaluate such a drug.[14]  This press release also stated that the

drug's "market potential is estimated to be at $300 million to $500 million."[15]

However, on September 1, 2004, GeoPharma filed an application

with the FDA seeking approval to market a *medical device* by the name of

Mucotrol Concentrated Oral gel wafer ("Mucotrol").[16]  The FDA granted approval

for Mucotrol to be marketed as a medical device in a letter dated November 24,

---

[11]   *See id.* ¶ 7(a)-(c).

[12]   *See id.* ¶ 7(a).

[13]   *Id.* ¶ 34.

[14]   *See id.* ¶ 36.

[15]   *Id.*

[16]   *See id.* ¶ 40.

-7-

2004 ("FDA Letter").[17]  Defendants did not disclose either the September

application or the FDA's approval of a medical device until December 2, 2004.[18]

## B.   The December 1 Release

On December 1, 2004, prior to the opening of the markets,

GeoPharma issued a press release entitled "GeoPharma, Inc. Receives FDA

Approval for Mucotrol™; Manages Mucositis Caused by Radiation and

Chemotherapy Required in Cancer Treatment."[19]  The December 1 Release stated

in pertinent part that "GeoPharma, Inc. today announced that Belcher

Pharmaceuticals, Inc., a wholly-owned subsidiary of GeoPharma, Inc., has

received approval from the [FDA] for Mucotrol™, a *prescription product* for the

management of oral mucositis/stomatitis."[20]  The Release further stated that, given

the number of people who suffer from mucositis, "oncology market potential for

Mucotrol™ sales are between $75 million and $300 million per annum and the

---

[17]     *See id.* ¶ 41.

[18]     *See id.* ¶ 54.  Plaintiffs now allege that the FDA Letter was not posted
on the agency's website until December 6, 2004.  *See id.* ¶ 42.

[19]     *Id.* ¶ 48.

[20]     *Id.* (emphasis added) (the "prescription product statement").

estimated global market is between $250 million and $1 billion per annum."[21]

Immediately after the December 1 Release, GeoPharma's stock price reached an all-time high of $11.25 per share, an increase of 153%.[22]  Volume was extraordinary – 42 million shares changed hands on December 1, as opposed to an average daily volume of 22,000 shares.[23]

### C.    Corrective Disclosures

Responding to media inquiries immediately after the December 1 Release, an FDA spokesperson erroneously stated that the agency had no record of *any* approval for Mucotrol.[24]  After this FDA statement, the price of GeoPharma stock tumbled.  When trading was halted at 1:30 p.m. on December 1, the stock had fallen to $6.81 per share.[25]  The FDA then clarified that Mucotrol had received marketing approval as a medical device.[26]

---

[21]     *Id.* ¶ 49 (the "market potential statement").  Plaintiffs also allege that GeoPharma had a duty to disclose the existence of competing medical devices in the December 1 Release.  *See id.* ¶ 52(c).

[22]     *See id.* ¶ 51.

[23]     *See id.*

[24]     *See id.* ¶ 53.

[25]     *See id.*

[26]     *See id.*  Plaintiffs blame GeoPharma for the FDA's confusion: "Since GeoPharma had previously described Mucotrol as a drug, members of the media

The next morning, GeoPharma issued another press release to address

the confusion caused by the December 1 Release, stating that:

> The Company's application to the FDA requested approval for [Mucotrol] to be approved to be marketed for the mechanical action indicated for the management of pain by soothing oral lesions caused by chemotherapy or radiotherapy mucositis/stomatitis, oral irritations due to oral surgery, braces or dentures in addition to diffusing apthous ulcers. Although it is estimated that approximately 300,000 cancer patients in the U.S. suffer from mucositis, revenues from the Company's distribution of Mucotrol™ cannot be estimated at this time.[27]

After the markets closed on December 2, GeoPharma and two of the

individual defendants held a conference call with investors to discuss the

December 1 Release. On the call, defendants Mihir Taneja and Sekharam stated

that they had not yet attempted to estimate Mucotrol's potential revenues.[28] Asked

why previous company releases referred to development of a drug to treat

mucositis when Mucotrol was in fact a device, Sekharam stated that GeoPharma

initially tried to develop a drug treatment but ended up with a device.[29] After the

---

likely [initially] called the FDA's Center for Drug Evaluation and Research ("CDER") . . . [h]ence, employees at CDER had no reference to GeoPharma or Mucotrol in its databases." *Id.* ¶ 53 n.3.

[27]     *Id.* ¶ 54.

[28]     *See id.* ¶¶ 58, 60-61.

[29]     *See id.* ¶ 56.

conference call, GeoPharma's share price fell 12.48% in after-market activity on December 2, to $6.45 per share.[30] The shares fell to $5.46 per share the next day.[31]

### D.   Scienter Allegations

Plaintiffs allege that in 2004, GeoPharma embarked on a strategy to transition from a producer of dietary supplements into a drug manufacturer — a transition requiring capital infusions.[32] To this end, GeoPharma entered into three separate financing arrangements in the Spring of 2004. The terms of each agreement vary, but these agreements generally provide that, if GeoPharma's common stock attained a certain average closing price for at least five consecutive days, "[d]efendants could force a portion of its note holders and preferred shareholders to accept shares of [GeoPharma's] common stock in lieu of cash payments."[33] Plaintiffs allege that defendants, frustrated by GeoPharma's inability throughout 2004 to attain the required closing price, embarked on a scheme that would relieve GeoPharma of its obligation to "make expensive monthly cash

---

[30]   *See id.* ¶ 62.

[31]   *See id.*

[32]   *See id.* ¶¶ 23-24, 33, 35, 37-38.

[33]   *Id.* ¶ 32; *see also id.* ¶¶ 25-31 (detailed terms of all three agreements). The lowest target average closing price was $7.19 per share. *See id.* ¶ 32.

payments to the Company's note holders and preferred stock owners."[34]

Plaintiffs also allege that defendants knew, or were reckless in not knowing, that the December 1 Release was materially false or misleading. Specifically, plaintiffs allege that defendants' scienter is evidenced by their failure to disclose their knowledge of (1) GeoPharma's September 2004 application for FDA approval of Mucotrol as a medical device; (2) the November 24 FDA approval of Mucotrol as a medical device; and (3) GeoPharma's use of revenue projections consistent with a new drug, rather than a medical device.[35]

## IV.   LEGAL STANDARD

### A.   Standard of Review

A motion to dismiss pursuant to Rule 12(b)(6) should be granted only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief.'"[36]  When deciding a motion to dismiss, courts must accept all factual allegations in the complaint as true, and

---

[34]   *Id.* ¶ 32.

[35]   *See id.* ¶ 72.

[36]   *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

-12-

draw all reasonable inferences in plaintiff's favor.[37] Although the plaintiff's
allegations are taken as true, the claim may still fail as a matter of law if it appears
beyond doubt that the plaintiff can prove no set of facts in support of its claim
which would entitle it to relief, or if the claim is not legally feasible.[38]

## B.   Scienter

A prima facie case of securities fraud under section 10(b) and Rule
10b-5 requires that "the defendant, in connection with the purchase or sale of
securities, made a materially false statement or omitted a material fact, with
scienter, and that plaintiff's reliance on defendant's action caused injury to the
plaintiff."[39] The requisite state of mind, or scienter, in an action under section
10(b) and Rule 10b-5 is "'an intent to deceive, manipulate or defraud.'"[40]

Under the Private Securities Litigation Reform Act ("PSLRA"), the
complaint must "state with particularity facts giving rise to a strong inference that

---

[37]   *See Ontario Pub. Serv. Employees Union Pension Trust Fund v.
Nortel Networks Corp.*, 369 F.3d 27, 31 (2d Cir. 2004) (citation omitted).

[38]   *See, e.g., Official Comm. of Unsecured Creditors of Color Tile, Inc. v.
Coopers & Lybrand, L.L.P.*, 322 F.3d 147, 158 (2d Cir. 2003).

[39]   *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir. 2003) (quotation and
citation omitted).

[40]   *Ganino v. Citizens Utils. Corp.*, 228 F.3d 154, 168 (2d Cir. 2000)
(quoting *Ernst & Ernst*, 425 U.S. at 193 n.12).

-13-

the defendant acted with the required state of mind."[41] "Although speculation and

conclusory allegations will not suffice, neither do we require 'great specificity'

provided the plaintiff alleges enough facts to support 'a strong inference of

fraudulent intent.'"[42] Facts giving rise to a strong inference of scienter can be

alleged by one of two methods: the plaintiff may plead "motive and opportunity to

commit fraud" or "strong circumstantial evidence of conscious misbehavior or

recklessness."[43]

## 1.    Motive and Opportunity

"Motive would entail concrete benefits that could be realized by one

or more of the false statements and wrongful nondisclosures alleged," while

"[o]pportunity would entail the means and likely prospect of achieving concrete

benefits by the means alleged."[44] "Motives that are generally possessed by most

corporate directors and officers do not suffice; instead, plaintiffs must assert a

concrete and personal benefit to the individual defendants resulting from the

---

[41]    15 U.S.C. §78u-4(b)(2).

[42]    *Ganino*, 228 F.3d at 169 (quoting *Stevelman v. Alias Research Inc.*,
174 F.3d 79, 84 (2d Cir. 1999)).

[43]    *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quotation and
citation omitted). *Accord Novak*, 216 F.3d at 311.

[44]    *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994).

-14-

fraud."[45]  The desire "to inflate stock prices while [defendants] sold their own

shares" may support a viable claim.[46]  Some courts have also found that a

company's desire to inflate its stock price in order to complete a stock-based

acquisition can establish scienter.[47]  As for opportunity, courts often assume that

corporations and their officers have the opportunity to commit fraud,[48] but

opportunity may not exist if the alleged scheme had no chance of succeeding.[49]

## 2.   Conscious Misbehavior or Recklessness

When plaintiffs have failed to plead motive and opportunity, "it is

still possible to plead scienter by identifying circumstances indicating conscious

behavior [or recklessness] by defendant, though the strength of the circumstantial

---

[45]     *Kalnit,* 264 F.3d at 139.

[46]     *Id. Accord Novak,* 216 F.3d at 307 (same).

[47]     *See Rothman,* 220 F.3d at 94 (allegations that defendants inflated
stock price with an eye towards acquiring another company helped support
scienter inference); *In re Vivendi Universal, S. A. Sec. Litig.,* 381 F. Supp. 2d 158,
185 (S.D.N.Y. 2003) ("Scienter may be imputed . . . when defendants were
motivated to inflate company stock prices as a means to effectuate a specific
acquisition that would not otherwise be possible.").

[48]     *See, e.g., In re Time Warner Sec. Litig.,* 9 F.3d 259, 269 (2d Cir.
1993).

[49]     *See Shields,* 25 F.3d at 1120.

-15-

allegations must be correspondingly greater."[50]  To allege recklessness, the facts

must "approximate an actual intent to aid in the fraud being perpetrated."[51]

Plaintiff must allege facts showing that the defendants' conduct was "highly

unreasonable, representing an extreme departure from the standards of ordinary

care to the extent that the danger was either known to the defendant or so obvious

that the defendant must have been aware of it."[52]  Recklessness is often shown

when plaintiff "specifically alleges defendants' knowledge of facts or access to

information contradicting their public statements."[53]

## V.   DISCUSSION

### A.   Scienter

#### 1.   Motive and Opportunity

In the September 30 Opinion, I held that plaintiffs' motive allegations

failed "for a fundamental reason – the alleged scheme could not possibly have

---

[50]   *Kalnit,* 264 F.3d at 142 (quotation and citation omitted).

[51]   *Chill,* 101 F.3d at 269 (quotation and citation omitted).

[52]   *Rothman,* 220 F.3d at 90 (citing *Novak,* 216 F.3d at 308).  The
Second Circuit has also noted that "[a]n egregious refusal to see the obvious, or to
investigate the doubtful, may in some cases give rise to an inference of . . .
recklessness."  *Chill,* 101 F.3d at 269 (quotation and citation omitted).

[53]   *Novak,* 216 F.3d at 308.

-16-

succeeded. The FDA approval of Mucotrol was public information, and it would
have been obvious *ex ante* to defendants that financial reporters and/or analysts
would contact the FDA immediately after the December 1 Release (which is of
course what occurred)."[54] Thus, "[t]here was never the slightest chance that
GeoPharma stock could be inflated by the December 1 Release for anywhere close
to the five days needed to carry out the alleged scheme."[55]

       Plaintiffs assert that this holding amounted to improper hindsight
analysis.[56] Plaintiffs are mistaken. The September 30 Opinion did not rely on the
fact that the scheme happened to fail in this case, but rather on whether a rational
defendant could have *expected* that the alleged scheme could succeed.[57] And

---

[54]    *GeoPharma*, 399 F. Supp. 2d at 449-50.

[55]    *Id.* at 450.

[56]    *See* Lead Plaintiffs' Opposition to Defendants' Motion to Dismiss the
Consolidated Second Amended Class Action Complaint ("Pl. Opp.") at 1-3.

[57]    *See White v. H.R. Block, Inc.*, No. 02 Civ. 8965, 2004 WL 1698628,
at *8 (S.D.N.Y. July 28, 2004) (where plaintiffs alleged that defendant concealed
true facts regarding pending litigation through "silence or anodyne references" to
such litigation, defendant could not have profited from alleged scheme due to
existence of publicly-available information on litigation); *In re CDNOW Sec.
Litig.*, 138 F. Supp. 2d 634, 642 (E.D. Pa. 2001) (motive allegations to conceal
financial difficulties from potential merger partners fatally flawed because any
concealment would not long survive due diligence scrutiny by a merger partner);
*In re Time Warner Sec. Litig.*, 794 F. Supp. 2d 1252, 1260 (S.D.N.Y. 1992), *rev'd
on other grounds*, 9 F.3d 259 (2d Cir. 1993) (motive allegations "fatally flawed"
when alleged scheme could not "rationally have been expected to succeed").

-17-

given that the December 1 Release made a rapidly verifiable representation about

FDA action already taken, plaintiffs' cases involving misrepresentations about the

likelihood of *future* FDA action are inapposite.[58] When evaluating motive and

opportunity allegations, the Second Circuit authorizes inquiry, even at the motion

to dismiss stage, as to whether plaintiffs allege a scheme that has any chance of

achieving its putative ends.[59]

---

[58]    *See Irvine v. Imclone Sys., Inc.*, No. 02 Civ. 109, 2003 WL 21297285,
at *1 (S.D.N.Y. June 4, 2003) (defendants knowingly made a fraudulent prediction
about likelihood of future FDA approval of company's drug); *In re Vicuron
Pharm., Inc. Sec. Litig.*, No. Civ.A 04-2627, 2005 WL 2989674, at **1, 7 (E.D.
Pa. July 1, 2005) (same). Plaintiffs similarly misread *Florida State Bd. of Admin.
v. Green Tree Fin. Corp.*, 270 F.3d 645 (8th Cir. 2001), because that court merely
disagreed with the lower court's conclusion that, *on the facts of that case*, the
alleged scheme was "so unlikely to succeed that the court would not infer that
[defendant] tried it." *Id.* at 662; *see also id.* at 661-62 (reviewing allegations
supporting inference that defendant *did* expect scheme to succeed).

[59]    For example, in *Shields*, plaintiff alleged that defendant concealed a
bank's poor financial condition. The court found that motive and opportunity was
not adequately pleaded because the alleged scheme could not have hidden the
bank's condition for very long:

> It is hard to see what benefits accrue from a short respite from an
> inevitable day of reckoning. There is no claim here that false
> statements were made in an effort to sell off shares held by
> management, or to delay a criminal prosecution. For related
> reasons, the Complaint fails to allege a sufficient opportunity to
> derive a benefit from the alleged misstatements and
> nondisclosures: the ordinary course of bank business would lead
> to the review of the loan portfolios, as it did.

-18-

That said, plaintiffs have clarified their allegations in a manner that merits reconsideration of this aspect of the September 30 Opinion. Plaintiffs note that the "target price that triggered the conversion feature [of one of the securities purchase agreements] was the average closing price of five consecutive trading days."[60] "Therefore, even when the full extent of the fraud was discovered after only two days, *as was the actual case here,* the scheme could have succeeded."[61] Given this clarification, it is conceivable, although extremely unlikely, that defendants might have expected to confuse the market for the required length of time, and thus inflate GeoPharma stock by the required amount.[62]

Even assuming *arguendo* that the alleged scheme could have succeeded, plaintiffs have not sufficiently addressed the independent grounds for

---

*Shields*, 25 F.3d at 1130.

[60]    Pl. Opp. at 25 (citing Complaint ¶ 27).

[61]    *Id.* (emphasis in original). Plaintiffs further explain that "if GeoPharma's stock had closed at $10 per share on December [first] and [second] (instead of the actual closing prices of $6.81 and $7.37, respectively), the average five day closing price would have been $7.25 per share (($10+$10+$5.46+$5.35+$5.44)/5 days) and the $7.19 target price [for one of the securities purchase agreements] reached." *Id.*

[62]    *See In re Time Warner*, 9 F.3d at 269-70 (reversing district court's holding that plaintiffs' motive allegations were irrational, as record was "insufficient to preclude *all* possibility of developing proof that a motive in fact existed.") (emphasis added). *But see infra* notes 82-85 and accompanying text.

rejecting their motive and opportunity allegations. The September 30 Opinion

noted that "[c]ourts in this Circuit have consistently held that allegations that a

defendant was motivated to commit securities fraud by a desire to reduce its debt

burden, or otherwise reduce borrowing costs, are insufficient to raise a scienter

inference."[63] "Plaintiffs' allegations that GeoPharma sought to reduce its cash

outlays for debt service fall squarely into this category."[64]

      Plaintiffs offer two arguments, but no new allegations, to dispute this

holding. Plaintiffs first repeat their argument from the first motion to dismiss that

the desire to inflate the stock to activate the conversion feature of GeoPharma's

financing agreements is a valid motive because it represents a "specific corporate

transaction."[65] This argument is no more convincing now, given that plaintiffs

---

[63]     *GeoPharma,* 399 F. Supp. 2d at 450 (citing *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 814 (2d Cir. 1996), rejecting motive allegations based on the theory that an inflated stock price would maximize marketability of debt securities issued during the class period).

[64]     *Id.* (citing *In re Duane Reade Inc. Sec. Litig.,* No. 02 Civ. 6478, 2003 WL 22801416, at *8-9 (S.D.N.Y. Nov. 25, 2003) and *Leventhal v. Tow,* 48 F. Supp. 2d 104, 115 (D. Conn. 1999)); *see also Wilson v. Bernstock,* 195 F. Supp. 2d 619, 637 (D.N.J. 2002) (alleged motive to ensure continued ability to borrow for operational costs insufficient); *In re Crown Am. Realty Trust Sec. Litig.,* No. Civ.A. 95-202J, 1997 WL 599299, at **13-14 (W.D. Pa. Sept. 15, 1997) (alleged motive to minimize interest rates insufficient).

[65]     Pl. Opp. at 24.

again rely only on cases where motive was alleged because the defendant company intended to carry out corporate *acquisitions*.[66]

Plaintiffs also assert that GeoPharma's motive, properly understood, was to achieve its strategic goal of "transforming the company into a generic drug manufacturing and distribution company," not merely to reduce its debt load and maintain a sound balance sheet.[67]  In response, defendants correctly note that "transforming [GeoPharma] into a generic drug manufacturing company [is an

---

[66]    *See In re Vivendi Universal,* 381 F. Supp. 2d at 185 (allegation that defendant intended to use inflated stock to "acquire and continue acquiring" several companies); *Burstyn v. Worldwide Xceed Group, Inc.,* No. 01 Civ. 1125, 2002 WL 31191741, at *5 (S.D.N.Y. Sept. 30, 2002) (defendants' specific goal was to acquire companies).  As noted in the September 30 Opinion, "the motive to acquire another company can support an inference of scienter because, unlike the motive to reduce borrowing costs, it is a motive not generally possessed by all corporations."  *GeoPharma,* 399 F. Supp. 2d at 451 (citation omitted).

Plaintiffs rely on *In re Twinlab Corp. Sec. Litig.,* 103 F. Supp. 2d 193, 206 (E.D.N.Y. 2000), noting that the court "accept[ed] motive to inflate the stock price to maximize revenue from the secondary offering, so as to provide it capital to retire debt."  Pl. Opp. at 24 (quotation omitted).  However, the corporate defendant in that case was attempting to inflate stock in order to (1) maximize revenue from a secondary stock offering, which would help retire debt *and complete a corporate acquisition*; as well as (2) to maximize the value of its stock for a stock-for-stock trade with another company.  *See In re Twinlab,* 103 F. Supp. 2d at 206.  In finding these motive allegations sufficient, the *Twinlab* court relied on two cases involving public offerings of stock, and/or stock-for-stock trades, *not* the desire to reduce a company's debt load or debt service costs which is a generalized motive common to most, if not all, corporations.

[67]    Pl. Opp. at 23-24.

invalid motive because it] would benefit all shareholders generally, not just defendants."[68]  In fact, the only tangible benefit from the alleged scheme would be lower debt service.  Plaintiffs' new characterization of the same allegations cannot change the result – after all, any otherwise-invalid motive can usually be framed as part of some "strategic goal."[69]  Moreover, the Amended Complaint itself emphasizes that it was important for GeoPharma to activate the conversion features because of its limited cash reserves.[70]

───────────────

[68]   Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss the Consolidated Second Amended Class Action Complaint ("Reply Mem.") at 4 (citing *Kalnit*, 264 F.3d at 140, where the desire to obtain a good merger deal did not establish motive because "the shareholders themselves would benefit from a superior transaction"); *cf. In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510, 2005 WL 2277476, at *19 (E.D.N.Y. Sept. 19, 2005) (citation omitted) (motive to inflate stock in order to make company more attractive to outside investors insufficient, as desire to raise "much needed capital" is motive common to all corporations).

[69]   Plaintiffs rely on an opinion in the Vivendi litigation, which held that, while defendants in that case argued that the alleged motive was merely to prop up the share price, that aim was "'merely instrumental' to the larger goal of 'creating an entertainment empire.'" Pl. Opp. at 24 (quoting *In re Vivendi Universal S.A. Sec. Litig.*, No. 02 Civ. 5571, 2004 WL 876050, at *8 (S.D.N.Y. Apr. 22, 2004)). But the method of creating the "empire" in that case was through acquiring companies. *See id.* (relying wholly on cases where the motive to *acquire* other companies raised scienter inference); *see also In re Vivendi Universal*, 381 F. Supp. 2d at 185 (describing Vivendi's acquisitive desires).

[70]   *See* Complaint ¶ 24 ("[a]t the start of 2004, GeoPharma had only $920,500 in cash"); *id.* ¶ 32 ("defendants were required to, and did, make expensive monthly payments to the Company's note holders and preferred stock

Finally, the Amended Complaint, like the earlier Complaint, is devoid

of motive allegations against the individual defendants.[71] Defendants note that the

alleged scheme would have *harmed* the individual defendants, because converting

debt into equity would dilute their stock holdings.[72]

## 2.    **Conscious Misbehavior or Recklessness**

Plaintiffs contend that, considered in the context created by

defendants' own statements as well as surrounding suspicious circumstances, the

Amended Complaint adequately pleads defendants' intent to mislead or

_____  _____  _____

holders"); *id.* ¶ 33 ("Faced with the expensive ongoing costs of principal, interest
and dividend payments, Defendants embarked on a scheme which would enable
them to reduce the Company's monthly cash payments.").

[71]    No individual defendant is alleged to have sold GeoPharma stock
during the class period. *See id.* ¶ 63 (quoting defendants Mihir Taneja and
Sekharam stating that neither sold stock during class period).

[72]    *See* Memorandum of Law in Support of Defendant's Motion to
Dismiss the Consolidated Second Amended Class Action Complaint ("Def.
Mem.") at 14 (citation omitted).

Plaintiffs also assert, for the first time in their opposition brief, that
defendants hoped to "initially obscure the transformation of Mucotrol from a drug
to a device . . . in hopes that the market would more slowly digest that distinction."
Pl. Opp. at 25 n.19. To the extent that plaintiffs seriously contend that this
allegation constitutes a valid motive, I cannot consider it because a complaint
cannot be amended by an opposition brief. *See, e.g., GeoPharma*, 399 F. Supp. 2d
at 445 n.100 (citation omitted).

-23-

recklessness.[73]  While GeoPharma's behavior as depicted in this Complaint may be less than ideal for a publicly-traded corporation, plaintiffs have failed to meet the pleading burden imposed by the PSLRA.  For the following reasons, and even considering plaintiffs' allegations as a whole,[74] I cannot conclude that defendants exhibited the "extreme departure from the standards of ordinary care" characteristic of recklessness.[75]

### a.   Failure to Disclose FDA Letter

Plaintiffs have described the prescription product statement as an affirmative misstatement, and argued the recklessness issue through that lens. However, the prescription product statement is best analyzed as an *omission*. While GeoPharma disclosed its FDA approval for Mucotrol, it omitted the more detailed and specific information regarding Mucotrol's approval as a *medical*

---

[73]     *See* 1/17/06 Transcript of Oral Argument ("Tr.") at 14 (statement of Jeffrey Berens, counsel for plaintiffs) ("[defendants] can't ignore the context that they created for the market and make technically accurate statements and say, 'well, it was true, I didn't mean to do anything wrong.'  If the Court finds that they made a false and misleading statement . . . then it follows that defendants had a duty not to make that false and misleading statement.").

[74]     *See, e.g., In re WorldCom Sec. Litig.*, 294 F. Supp. 2d 392, 417 (S.D.N.Y. 2003) (quotation and citation omitted) ("The allegations in the Complaint are entitled to be taken together to determine if the facts give rise to a strong inference of fraudulent intent.").

[75]     *Rothman*, 220 F.3d at 90.

*device.* The true gravamen of plaintiffs' allegations, then, is that the prescription product statement was "misleading, though not technically false, [because it amounted] to a half-truth by omitting some material fact."[76]

Plaintiffs ask this Court to infer scienter from the fact that the December 1 Release failed to disclose the precise nature of the FDA approval obtained by GeoPharma, as embodied in the November 24 FDA Letter.[77] Defendants do not and cannot dispute that GeoPharma was under a duty to disclose sufficient detail about Mucotrol to render the December 1 Release not misleading.[78]  Thus, enough detail about Mucotrol had to be disclosed in the December 1 Release to achieve that goal.  In granting the initial motion to dismiss, I held that "a reasonable investor *could have been* misled by failing to absorb the fine distinction between the terms 'drug' and 'prescription product'" — a conclusion reached at the pleading stage, with all reasonable inferences drawn in

---

[76]     *Fogarazzo*, 341 F. Supp. 2d at 294.

[77]     *See* Complaint ¶¶ 72-73; *see also* Pl. Opp. at 19-20 (contrasting precise language of FDA Letter with language employed in December 1 Release). Another way of describing the allegations is that plaintiffs allege that "prescription product" was a recklessly poor choice of words, but this is merely the other side of the "half-truth" coin.

[78]     *See, e.g., In re Time Warner*, 9 F.3d at 268 (citation omitted).

-25-

plaintiffs' favor.[79]

But a failure to disclose particular information, by itself, can only

constitute recklessness if there was an obvious duty to disclose that information.[80]

Given what defendants *did* disclose in the December 1 Release, there was no such

obvious duty to disclose the FDA Letter.  Therefore, plaintiffs must allege

something more to suggest that defendants *intended* to confuse the market by

omitting material information from the December 1 Release.[81]  For several

reasons, examining plaintiffs' allegations as a whole compels the conclusion that

defendants did not act *recklessly* when they issued the December 1 Release.

*First*, the tenuous plausibility of the alleged scheme substantially

weakens the overall strength of plaintiffs' scienter allegations.[82]  Although I have

_____

[79]     *GeoPharma*, 399 F. Supp. 2d at 447 (emphasis added).

[80]     *See Kalnit*, 264 F.3d at 143-44 (when duty to disclose letter was
unclear, "defendants' recklessness cannot be inferred from the failure to
disclose").

[81]     Plaintiffs often plead recklessness by alleging "defendants'
knowledge of facts or access to information contradicting their public statements."
*Novak*, 216 F.3d at 308.  But this option is not available here because there is no
contradiction between the December 1 Release and the FDA Letter.  *See* Def.
Reply at 5-6 (quotation and citation omitted) (noting that the FDA Letter clearly
states that Mucotrol is for prescription use).

[82]     *See In re 1993 Corning Sec. Litig.*, No. 93 Civ. 7015, 1996 WL
257603, at *7 (S.D.N.Y. May 15, 1996) (motive allegations substantially
weakened by their intrinsic illogic).

now found that the alleged scheme had a marginal chance of success, plaintiffs'

theory of the case is still internally inconsistent.[83]  Plaintiffs assert that:

> In the end, it was the enormous trading volume and the
> unprecedented 150% stock price increase that caused reporters to
> take notice [of the December 1 Release] and ultimately dig deeper.
> Absent the one or two persistent reporters that decided to
> challenge Defendants' statements and to press the FDA (and
> presumably GeoPharma) for answers, the truth may not have
> become known for some time.[84]

Once again, plaintiffs are mistaken.  If defendants intended to mislead

the market into believing that Mucotrol was a drug, and if they hoped to inflate

their share price sufficiently to convert the debt into equity, they must have also

---

[83]    Courts often refuse to infer scienter, even on a recklessness theory,
when confronted with illogical allegations. *See, e.g., Davidoff v. Farina*, No. 04
Civ. 7617, 2005 WL 2030501, at *11 n. 19 (S.D.N.Y. Aug. 22, 2005) (no possible
inference of scienter when companies alleged to know of fraud that would cause
company to fail nonetheless invested heavily in that company, because "it would
have made no economic sense for defendants to invest literally billions of dollars
in a venture that they knew would fail"); *In re J.P. Morgan Chase Sec. Litig.*, 363
F. Supp. 2d 595, 621-22 (S.D.N.Y. 2005) (no scienter when "plaintiffs fail to
allege facts explaining why, if it was aware of Enron's problems, [defendant]
would have continued to lend Enron billions of dollars"); *Hampshire Equity
Partners II, L.P. v. Teradyne, Inc.*, No. 04 Civ. 3318, 2005 WL 736217, at *3
(S.D.N.Y. Mar. 30, 2005) (fundamentally illogical and contradictory scienter
allegations fail as a matter of law); *In re Merrill Lynch & Co. Research Reports
Sec. Litig.*, 272 F. Supp. 2d 243, 263 (S.D.N.Y. 2003) (when plaintiffs' allegations
contradicted the assumption that defendants would act in their own economic self-
interest, "the allegations in the Complaint affirmatively refute scienter").

[84]    Pl. Opp. at 27-28 (citing Complaint ¶ 70).

-27-

realized that any dramatic increase in share price would cause reporters to "dig deeper," check with the FDA,[85] and quickly uncover the scheme. Indeed, in this instance, the 150% increase in share price attracted sufficient media attention that the December 1 Release was clarified, and the inflated stock price dissipated, within hours.

*Second*, plaintiffs also allege that the use of the word "formula" to describe Mucotrol in the December 1 Release "reinforced the market's belief that Mucotrol was a drug . . . and can only lead to a stronger inference that Defendants did not merely innocently overlook the import of a single word."[86] However, as defendants note, "if the language defendants' used . . . in the December 1 [] Release can be probative of intent, then surely it is conclusively exonerating that defendants also said [in the December 1 Release] that Mucotrol only 'manages' mucositis – a description that, on plaintiffs' [own] allegations, definitively [signals to investors] that Mucotrol could not be a drug."[87]

---

[85]     The allegations that the November 24 FDA Letter: (1) was not available except through a FOIA request, *see* Complaint ¶ 41; and (2) was not available on the FDA website until December 6, *see id.* ¶ 70, are of no consequence. There are other ways to quickly obtain public information from government agencies, as obviously happened here.

[86]     Pl. Opp. at 21.

[87]     Reply Mem. at 8.

-28-

Indeed, the Complaint notes that "topical palliative agents, such as Mucotrol, [] are only able to help *manage* infections and pain resulting from mild-to-moderate oral mucositis . . . whereas a *drug* actually treats the oral mucositis."[88] Given the apparently clear distinction between "manage" and "treat," the use of the former term in the December 1 Release suggests that defendants were forthright in disclosing that they had not obtained approval for a *drug* that treats mucositis.[89]

  *Finally*, GeoPharma was not *hiding* anything from the market when it issued the December 1 Release, which drew the market's attention to the very source of information (the FDA) that would "unravel" the entire scheme. The true nature of the FDA approval of Mucotrol was reasonably available to the public on December 1, and for this reason as well it is difficult to find strong circumstantial evidence of recklessness, especially when GeoPharma promptly issued a new press release, and scheduled a conference call, once the confusion caused by the

---

[88]  Complaint ¶ 47 (citing a *New England Journal of Medicine* article).

[89]  In addressing this issue at oral argument, plaintiffs' counsel: (1) stated that the difference between "manage" and "treat" "is a fine distinction [if] any distinction;" and (2) reiterated that "defendants [knew] the context that they [had] created" at the time of the December 1 Release. Tr. at 19-20 (Berens). But as demonstrated above, the Amended Complaint itself asserts that this is a crucial distinction.

-29-

December 1 Release became apparent.[90]

    In sum, defendants had no clear duty to disclose the information in

the FDA Letter as part of the December 1 Release. Thus, without more, the failure

to disclose this information cannot constitute reckless behavior.[91] Rather, the most

that can be inferred from this omission is that defendants were negligent in failing

to anticipate how the market would respond to the prescription product statement.

To infer scienter from an arguably material omission, in the face of allegations that

cut against such an inference, and in the absence of valid motive allegations,

---

    [90]    *Cf. In re Nokia Corp. Sec. Litig.*, No. 96 Civ. 3752, 1998 WL 150963,
at *13 (S.D.N.Y. Apr. 1, 1998) (fact that company disclosed adverse information
earlier than normal reporting schedule undercuts alleged inference of recklessness
from not disclosing adverse information even sooner); *Goldberg v. Freedom Fed.
Savings Bank*, No. 88 C 4787, 1989 WL 8503, at *3 (N.D. Ill. Jan. 31, 1989)
(when defendant discovered through routine audit procedures, and promptly
disclosed, errors in its earlier earnings statements, "management candor vitiates
any inference of willful intent" with respect to those earnings statements; at most,
plaintiffs alleged negligence).

    [91]    *See White*, 2004 WL 1698628, at *9 (given availability of public
information about pending litigation, "[d]efendants' failure to discuss [the
litigation] at length – and defendants did discuss it publicly in some detail . . . –
can hardly be characterized as 'an extreme departure from the standards of
ordinary care'"); *Kalnit v. Eichler*, 99 F. Supp. 2d 327, 334 n.7, 343 n.15
(S.D.N.Y. 2000) (when plaintiff "just barely" pled a material omission, that
omission, standing alone, "simply cannot lead to a finding of recklessness"); *L.L.
Capital Partners, L.P v. Rockefeller Ctr. Props., Inc.*, 921 F. Supp. 1174, 1183
(S.D.N.Y. 1996) (when duty to disclose is "debatable," bare allegations that
defendants were reckless in failing to disclose are insufficient).

would be to expand the anti-fraud provisions of the securities laws beyond their
intended scope.[92]

### b.   Market Potential Statement

Plaintiffs also argue that the market potential statement in the

December 1 Release was false and/or misleading. In the September 30 Opinion, I

held that the market potential statement was not actionable because it was either:

(1) a forward-looking projection of revenues, protected by the PSLRA's safe

harbor as plaintiffs failed to plead that it was made with actual knowledge of its

falsity;[93] or (2) that it was a true statement of the total present market for all

products that address mucositis in any way. Although plaintiffs allege in their

---

[92]     *See Fogarazzo*, 341 F. Supp. 2d at 294 (scienter is a "distinct element
of securities fraud and ought not be confused or combined" with the requirement
that a statement be false or misleading); *cf. Novak*, 216 F.3d at 309 (violations of
generally-accepted accounting principles, without indications of "corresponding
fraudulent intent," do not suffice to establish strong circumstantial evidence of
recklessness).

[93]     *See GeoPharma*, 399 F. Supp. 2d at 448. The PSLRA safe harbor
applies because plaintiffs' failure to plead scienter demonstrates that plaintiffs
have not alleged that defendants knew their statement was false or misleading.
*See id.* at 448 n.122 (citing *High View Fund, L.P. v. Hall*, 27 F. Supp. 2d 420, 427
n.3 (S.D.N.Y. 1998) for the proposition that, when plaintiffs fail to plead scienter,
there is no need to examine whether plaintiffs have met the "marginally higher"
PSLRA standard for pleading actual knowledge of the falsity of a forward-looking
statement).

Complaint that the statement was a revenue projection,[94] they argue in their

opposition to the motion to dismiss that the market projection was a statement of

present fact, whether or not knowable with certainty.[95]

      Whichever it is, plaintiffs argue that they have alleged that defendants

acted with the requisite intent to deceive based on admissions by defendants that

they had not yet attempted to estimate Mucotrol's *revenues* at the time they issued

the December 1 Release.[96] Defendants, not surprisingly, agree that they had no

basis to estimate revenues.  They argue, however, that this is irrelevant because

the statement is properly read not as a revenue projection, but as an accurate

---

[94]    *See* Complaint ¶¶ 49, 52(d), 59-60, 72 (explicitly referring to the market potential statement as a revenue projection).

[95]    *See* Pl. Opp. at 8-9.

[96]    *See* Complaint ¶ 59 (quoting Mihir Taneja on the conference call: "[the market potential statement] is market opportunity. [W]e do expect . . . to get a significant [] in our mind amount of business out of this.  But once again, to determine [] our total estimated revenue is still yet to be determined.").  Plaintiffs rely on a case where a statement concerning the "potential market" for a drug was based on existing facts and was therefore not forward looking. However, in that case, plaintiffs alleged that the facts *underlying* the market potential statement were false. *See In re QLT Inc. Sec. Litig.*, 312 F. Supp. 2d 528, 532 (S.D.N.Y. 2004). Here, plaintiffs do not dispute the statistics concerning the number of mucositis sufferers that formed the basis of the market potential statement. *See* Tr. at 20 (Berens).

-32-

factual statement about the total size of the market for *all* mucositis products.[97]

Given the full context of the December 1 Release, and the complete

transcript of the December 2 conference call provided in the Amended Complaint,

plaintiffs' interpretation of the statement is not reasonable, even when viewed in

the light most favorable to the plaintiffs. The market potential statement is

explicitly based on the fact that "[i]t is estimated that approximately 300,000

cancer patients in the U.S. suffer from mucositis associated with cancer

treatments."[98] It is unreasonable to construe the statement to mean that

GeoPharma expected to derive *revenue* from every one of those patients. As I

noted during oral argument, "Ford Motor [Company] could say 'if I sold every car

in the country, there are 300 million car purchasers, that's how many sales there

would be, but that's not [a] revenue projection because nobody thinks everybody

is going to buy a Ford."[99]

During oral argument, plaintiffs struggled to articulate exactly how

---

[97]     *See* Reply Mem. at 8-10; *see also* Tr. at 32-33 (statement of Robert
Scher, counsel for defendants).

[98]     Complaint ¶ 49. *See* Tr. at 33 (Scher) (if the market potential
statement were a sales estimate, "there would be no reason in the sentence above it
to say how many total sufferers there were of mucositis . . . [t]he two sentences are
obviously connected.").

[99]     Tr. at 21-22 (statement of the Court).

they viewed the market potential statement, finally settling on "the size of the potential market for Mucotrol sales."[100]  However, this is nothing more than a revenue projection by another name.  Even if the potential market is a statement of present fact, plaintiffs have still not supported their allegation that this statement is either false or misleading.  While plaintiffs allege that defendants lacked a reasonable basis for the potential market statement,[101] the basis was provided by the Release's recitation of the total number of mucositis sufferers, a figure plaintiffs do not dispute.  Because this statement is neither false nor misleading, it is not actionable.

### c.    Failure to Disclose Competing Medical Devices

Because plaintiffs did not amend their allegations, they simply reassert their argument that GeoPharma's failure to disclose the existence of other

---

[100]    *Id.* at 35 (Berens, agreeing with the Court's statement of plaintiffs' position).

[101]    *See, e.g., id.* at 36 (statement of Samuel Rudman, counsel for plaintiffs) (statement is misleading because defendants "knew that [Mucotrol] was a medical device, the market didn't, and the competing medical devices had generated maybe a million or two million dollars of sales.  That's why were are alleging that to say the estimated market is 75 to 300 million was materially false and misleading because they had no way of knowing they could even come close to that").

-34-

medical devices managing mucositis in the December 1 Release was misleading.[102]
This argument was fully addressed (and rejected) in the September 30 Opinion,
and there is no reason to address it again.[103]

### d.   Other Scienter Allegations

Plaintiffs make several other scienter allegations not covered by the
foregoing discussion.  These allegations do not speak directly to defendants' intent
in making the prescription product statement, but instead charge defendants with
generally suspicious conduct outside the putative class period.  However, even
these allegations do not satisfy the required pleading standard.

Plaintiffs first allege that scienter is established by defendants' failure
to disclose, *prior to* the start of the class period on December 1, that Mucotrol had
evolved from a drug into a medical device.[104]  GeoPharma's last public statement
regarding a mucositis product before the December 1 Release, referring to a drug,
was in August 2004.  In September 2004, however, GeoPharma applied to the
FDA for approval as a medical device.  "Defendants' decision to allow untrue and
misleading information to remain in the market for at least four and a half months

---

[102]   *See* Pl. Opp. at 12-13.

[103]   *See GeoPharma*, 399 F. Supp. 2d at 448-49.

[104]   *See* Complaint ¶¶ 42-43, 73.

-35-

is probative of scienter."[105]   But plaintiffs fail to explain why an alleged actionable

omission *prior* to the class period adequately alleges scienter as to a statement

*during* the class period.[106]   Moreover, plaintiffs' related allegation that GeoPharma

violated its duty to disclose the FDA Letter within four days of its receipt on

November 24 is mistaken.[107]   GeoPharma complied with the relevant SEC

regulation, which requires disclosure within four *business* days of a "material

corporate event."[108]

---

[105]     Pl. Opp. at 18-19.  *Accord* Tr. at 39 (Rudman) (application "was a material event for [GeoPharma] in September and they should have issued an 8-K or a press release advising the market . . . the fact that they didn't do it is suggestive of recklessness or some type of intent").

[106]     Both cases cited by plaintiffs involve omissions rendering statements made *during* the putative class period misleading.  *See In re Initial Public Offering Sec. Litig. (In re Rediff Sec. Litig.)*, 358 F. Supp. 2d 189, 216 (S.D.N.Y. 2004) (failure to disclose advertising contracts and e-mail problems that contradicted rosy statements made *during* the class period "could be seen as conscious misbehavior"); *see also SEC v. Save the World Air, Inc.*, No. 01 Civ. 11586, 2005 WL 3077514, at *11-12 (S.D.N.Y. Nov. 15, 2005) (Maas, M.J.) (scienter established when statement made *during* class period belied by directly contradictory information in company's possession; defendant also criticized for failing to correct a statement made *during* class period).

[107]     *See* Complaint ¶ 42; *see also* Tr. at 39-40 (Rudman) (after receiving FDA Letter, "under SEC disclosure obligations, under Rule 8-K they had four days to disclose that [] clearly [] material event, and they should have disclosed it at that point in time, yet they waited a week to do so.").

[108]     *See* SEC Form 8-K at 2, *available at* http://www.sec.gov/about/forms/form8-k.pdf.  November 25, 2004 was

Moving farther afield, plaintiffs make several allegations regarding

GeoPharma's "prior history of making inaccurate representations in order to

capitalize on health fears."[109]  Plaintiffs also allege that a member of GeoPharma's

Board of Directors resigned without explanation on December 3, 2004.[110]

However, plaintiffs barely mention these allegations in their opposition brief,[111]

and in light of the overall weakness of the scienter inference created by the

Amended Complaint, these allegations are unavailing.

## B.   Group Pleading Doctrine

One issue remains which I will briefly address for the sake of

---

Thanksgiving, and thus December 1, 2004 was the fourth business day after
GeoPharma received the FDA Letter.

[109]    Complaint ¶ 64 (referencing a 1998 FDA warning letter citing
defendant Sekharam for improper marketing of certain natural remedies, and a
press release issued by GeoPharma in October 2001, at the height of the anthrax
scare, touting a product asserted to boost the immune system and protect against,
inter alia, anthrax).

[110]    *See id.* ¶ 65.  Plaintiffs made this allegation in the earlier  Complaint,
and cited *In re Mercator Software, Inc. Sec. Litig.*, 161 F. Supp. 2d 143 (D. Conn.
2001) for the proposition that a sudden director resignation is probative of
scienter.  That case stands for no such broad proposition – the court merely held
that, under the circumstances of that case, the resignation lent added credibility to
the allegations that the defendant company was having financial trouble
notwithstanding its representations to the contrary. *See id.* at 150.

[111]    Plaintiffs note as an aside that "of course, defendant Sekharam is no
stranger with respect to run-ins with the government for opportunistic, overly-
aggressive and misleading public claims." Pl. Opp. at 20 n.15.

completeness, although it is admittedly *dicta* given plaintiffs' failure to allege scienter.[112]  In the first Complaint, plaintiffs failed to make any specific allegations against defendant Jugal Taneja. Rather, plaintiffs invoked the "group pleading doctrine," which allows reliance on "a presumption that statements in . . . press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company."[113]

Although quite limited in scope, this doctrine may apply to outside directors such as Jugal Taneja, who "can fall within the group pleading presumption when, by virtue of their status or a special relationship with the corporation, they have access to information more akin to a corporate insider."[114] However, the September 30 Opinion held that "[a] bare allegation that Jugal Taneja is Chairman of the Board, in the absence of any specific allegation that he

---

[112]    The September 30 Opinion also determined that plaintiffs sufficiently alleged loss causation. *See GeoPharma*, 399 F. Supp. 2d at 453.  Defendants do not challenge loss causation on the present motion.

[113]    *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005) (quotation and citation omitted).  This doctrine is an exception to the general rule that "fraudulent statements must be linked directly to the party accused of the fraudulent intent." *Id.*

[114]    *In re Philip Services Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 483 (S.D.N.Y. 2004) (quotation and citation omitted).

played a role in the preparation of the December 1 Release, or otherwise took part in the day-to-day operations of GeoPharma, does not justify applying the group pleading doctrine."[115]

In the opposition brief to the first motion to dismiss, plaintiffs introduced several new facts regarding Jugal Taneja. Specifically, plaintiffs asserted that (1) Jugal Taneja is a large GeoPharma shareholder; (2) he is the father of defendant Mihir Taneja; (3) he signed a Form 10-K referenced in the Complaint; and (4) he had a consulting agreement with GeoPharma. While noting that a complaint cannot be amended by the opposition brief to a motion to dismiss, I opined that "it is unlikely that these new facts would establish that Jugal Taneja had a hand in the preparation of the December 1 Release, or had a special relationship with GeoPharma giving rise to an inference that he had access to information akin to a corporate insider."[116]

The facts introduced in plaintiffs' first opposition brief are now included in the amended complaint.[117] Notably, plaintiffs allege that Jugal Taneja had a consulting agreement with GeoPharma for which he was paid $200,000 per

---

[115]    *GeoPharma*, 399 F. Supp. 2d at 445 (citation omitted).

[116]    *Id.* at 445 n.100 (citation omitted).

[117]    *See* Complaint ¶ 7(a).

-39-

year – exceeding the *salaries* of both of the other individual defendants, the highest officers in the company.[118]  Plaintiffs also specify that Jugal Taneja owns 31% of GeoPharma common stock.[119]

On this basis, plaintiffs have now succeeded in bringing Jugal Taneja within the scope of the group pleading doctrine.  In *Schnall v. Annuity & Life Re (Holdings), Ltd.*, the court applied the group pleading doctrine to a Chairman of the Board, active in company affairs, who also had a significant consulting agreement with the company, and who often signed SEC Form 10-K's for the defendant company.[120]  Now that plaintiffs have alleged that Jugal Taneja owned almost one third of GeoPharma's stock, he also can be compared to the defendant from *In re Independent Energy Holdings*, where I held that a co-founder and largest shareholder of the defendant company was within the group pleading

---

[118]    *See id.*

[119]    *See id.*

[120]    *See Schnall v. Annuity & Life Re (Holdings), Ltd.*, No. 02 CV 2133, 2004 WL 231439, at \*\*4-5 (D. Conn. Feb. 4, 2004).  I do not rely on Jugal Taneja's signing of GeoPharma's June 29, 2004 Form 10-K – defendants are correct that *Schnall* is distinguishable on that score, as the Form 10-K's signed by the *Schnall* director were, unlike here, the statements on which plaintiffs were suing.  *See* Def. Reply at 10 n.20.

-40-

doctrine.[121]  While Jugal Taneja is not alleged to have taken part in the

preparation of the December 1 Release, the Complaint's allegations of his large

ownership share, combined with a consulting agreement that pays him more than

any employee of the company, give rise to the inference that he has a sufficient

special relationship to GeoPharma to apply the group pleading doctrine.[122]

## C.   Leave to Amend

Although plaintiffs again request leave to amend, further amendment

would be pointless.  Having already been given the opportunity to replead,

plaintiffs, who are represented by highly experienced counsel, have surely

presented all relevant facts by now, and have twice failed to plead scienter.[123]

---

[121]   *See In re Independent Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 767-68 (S.D.N.Y. 2001), *abrogated on other grounds by In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 352 (S.D.N.Y. 2003) (defendant held 3% of company stock, and was a company co-founder; plaintiffs alleged that defendant was significantly involved in company affairs).

[122]   I afford no weight to plaintiffs' conclusory allegations, *see* Complaint ¶¶ 8-13, that all individual defendants exercised control over GeoPharma during the relevant time period. *See Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476, 494 (S.D.N.Y. 2005) (rejecting conclusory assertions that certain defendants exercised control over company for group pleading purposes).

[123]   *See Kalnit*, 99 F. Supp. 2d at 344 (citing *Chill*, 101 F.3d at 272) (futility is solid ground for denying leave to amend complaint).

Accordingly, the Amended Complaint is dismissed with prejudice.[124]

### D.    Rule 11

Upon final adjudication of a securities fraud action, the PSLRA

requires the court to make findings regarding each attorney's compliance with

Rule 11(b) of the Federal Rules of Civil Procedure.[125]  As this Opinion and Order

constitutes a "final adjudication" within the meaning of the PSLRA, I must make

the required findings.  Based on a preliminary review of the record, I do not

believe that Rule 11 was violated in this case.  Plaintiffs' contentions, although

ultimately unsuccessful, were objectively reasonable and supported by colorable

interpretations of existing precedent.[126]

Defendants may request the imposition of sanctions within ten days

---

[124]    As in the first Opinion, the failure to plead a section 10(b) violation
dooms plaintiffs' Section 20(a) claims.  *See GeoPharma*, 399 F. Supp. 2d at 454.

[125]    *See* 15 U.S.C. § 78u-4(c)(1); *see also Gurary v. Nu-Tech Bio-Med,
Inc.*, 303 F.3d 212, 215 (2d Cir. 2002).

[126]    In fact, plaintiffs identified a material omission which rendered a
statement objectively misleading, *see GeoPharma*, 399 F. Supp. 2d at 446-47; and
adequately alleged loss causation, *see id.* at 453.  And as I noted in a similar case,
a repeated failure to plead scienter, by itself, hardly renders a complaint frivolous,
as "[t]he element of scienter is often the most difficult and controversial aspect of
a securities fraud claim." *Kalnit*, 99 F. Supp. 2d at 345 (finding that a plaintiff
who twice failed to plead scienter did not violate Rule 11).

-42-

of the date of this Opinion and Order.[127]  If such a request is made, plaintiffs need

respond only if directed by the Court.

## VI.   CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted,

with prejudice.  The Clerk of the Court is directed to close the pending motion.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated: New York, New York
       January 27, 2006

---

[127]   Any such request must be made by letter, not to exceed ten double-spaced pages.  In considering whether to request sanctions, defendants must bear in mind that Rule 11 sanctions are only imposed "'where it is patently clear that a claim has absolutely no chance of success.'"  *Caisse Nationale De Credit Agricole-CNCA v. Valcorp, Inc.*, 28 F.3d 259, 264 (2d Cir. 1994) (quoting *Healey v. Chelsea Res., Ltd.*, 947 F.2d 611, 626 (2d Cir. 1991)).

## - Appearances -

*Counsel for Plaintiffs:*

Samuel H. Rudman, Esq.
David A. Rosenfeld, Esq.
Mario Alba, Jr., Esq.
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100

Jeffrey A. Berens, Esq.
Kip B. Shuman, Esq.
DYER & SHUMAN, LLP
801 East 17th Avenue
Denver, CO 80218-1417
(303) 861-3003

*Counsel for Defendants:*

Robert A. Scher, Esq.
Jeremy L. Wallison, Esq.
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
(212) 682-7474